[No. D057568. Fourth Dist., Div. One. June 27, 2012.]

THE PEOPLE, Plaintiff and Respondent, v.
JOHN RENE LOZA et al., Defendants and Appellants.

## COUNSEL

Patricia L. Brisbois, under appointment by the Court of Appeal, for Defendant and Appellant John Rene Loza.

Christine Vento, under appointment by the Court of Appeal, for Defendant and Appellant Jeanne Lynn Loza.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General, Peter Quon, Jr., Christopher Beesley and Randall D. Einhorn, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**AARON, J.—**

I.

INTRODUCTION

Defendants John Rene Loza and his wife, Jeanne Lynn Loza,[1] appeal from judgments entered after a jury convicted them of first degree murder.

On appeal, John contends (1) that his conviction for first degree murder must be reversed because the trial court erred when it instructed the jury on a "legally inadequate" alternate theory of felony murder; (2) that the trial court erred in admitting evidence that John was associated with the Vagos Motorcycle Club (Vagos); and (3) that there is insufficient evidence to support the finding that John personally and intentionally discharged a gun and inflicted great bodily injury or death. Jeanne contends (1) that the trial court erred in instructing the jury that an aider and abettor is "equally guilty" as the perpetrator of a criminal act pursuant to former CALCRIM No. 400, because an aider and abettor's mental state is personal and is not tied to the mental state of the perpetrator; (2) that in response to the jury's questions pertaining to the mental state of an aider and abettor, the trial court failed to adequately clarify for the jury that it must consider the mental state of an aider and abettor and that an aider and abettor may have a mental state that is different from the mental state of the direct perpetrator; (3) that the trial court inadequately responded to the jury's questions concerning whether a person must be alive in order to have been kidnapped; (4) that there is insufficient evidence to support her conviction for first degree murder under either a felony-murder theory or as a premeditated murder; (5) that her rights to due process and a fair trial were violated when John unexpectedly testified in a manner that allowed the prosecutor to allege an additional charge of felony murder based on kidnapping; and (6) that the cumulative effect of the claimed errors requires reversal. John and Jeanne also join in any contentions raised by the other that may accrue to his or her benefit.

We conclude that Jeanne's attorney's failure to object to the trial court's instructions to the jury concerning the intent element of aiding and abetting, as well as to the court's response to the jury's questions on this issue, constitutes ineffective assistance of counsel and requires reversal of Jeanne's first degree murder conviction. We reject the defendants' other claims of

---

[1] Because the defendants share the same last name, we will refer to them by their first names.

error. We therefore affirm the judgment as to John, and reverse it as to Jeanne. We remand the case to the trial court for further proceedings as may be necessary with respect to Jeanne.

## II.

## FACTUAL AND PROCEDURAL BACKGROUND

### A. *Factual background*

#### 1. *The prosecution's case*

Kathleen Barnes[2] and her longtime boyfriend, John Rintalan, the victim in this case, lived in a house on Lytle Creek Road. Barnes rented the house, and rented out rooms in the house to her friends, Connie Lee and Richard. Barnes also rented a small guesthouse on the property to John and Jeanne. Barnes had been laid off from her job in September 2006 and was being treated for cancer. By January 2007, her unemployment income ran out and money became a problem for her.

Sometime in February 2007, Jeanne demanded that Barnes return a lamp that Jeanne had previously given her because Jeanne was angry with Rintalan. Over the next few weeks there was tension between the Lozas and Rintalan. At one point, Jeanne told Barnes that Rintalan had locked the back door to the main house, thereby preventing Jeanne and John from having access to the main house to use the bathroom.[3]

On the morning of March 13, 2007, Rintalan went to work. Barnes and Lee ran errands and returned to the house at approximately 3:00 or 4:00 p.m. They left again and returned at approximately 9:00 p.m. When they returned at 9:00 p.m., Rintalan did not seem to be at the house, but his motorcycle was parked in front of the garage. This was unusual because Rintalan loved his motorcycle and would not typically leave it out unattended and unsecured. In addition, it appeared that things in the backyard had been toppled or were in disarray. Barnes called out for Rintalan, but he did not respond. Barnes became nervous when she saw a bloody towel in the yard. Inside the house, Barnes noticed that a telephone message she had left for Rintalan on an answering machine earlier in the evening had been erased.

Barnes and some neighbors searched for Rintalan, but were unable to find him.

---

[2] Barnes died before the trial in this case. The court admitted her testimony from the preliminary hearing at trial.

[3] The guesthouse did not have a bathroom.

Laura Paris, who lived next door, testified that she had been outside talking with her sister on March 13 as it was getting dark. She heard noises that sounded like a fight coming from Barnes's property. Paris moved closer to Barnes's property and saw a short woman, who was not Barnes, standing near a fence. Paris was too far away from the woman to be able to identify her. Paris asked the woman what was going on, and the woman responded that Rintalan was shooting at squirrels. Paris told her husband that she thought she had heard Rintalan calling for help.

Later that night, Jeanne came into the main house and told Barnes and Lee that Rintalan had gotten into a car with "some Mexicans" who had later dumped him along the highway in a place where he could not be picked up. Jeanne said that Rintalan would be back for his motorcycle. However, Jeanne also said that Rintalan was "not going to come back, don't worry about it, and we're not going anywhere, Connie and I don't need to leave."

Jeanne and John left that night, before Barnes reported to the authorities that Rintalan was missing. They left behind a large container of their belongings. Barnes did not see Jeanne and John again until the court proceedings began.

The following day, Barnes saw that the yard had been cleaned up to some extent. She noticed that a bloody rock that she had seen the previous day and the bloody towel were no longer there. Barnes saw bloody handprints on a tree, and found Rintalan's sunglasses on the ground near his motorcycle. Barnes called the police and reported that Rintalan was missing.

A deputy who responded to Barnes's residence noticed a number of suspicious things around the yard. He saw blood on the ground in several areas, disturbed and trampled vegetation, and various items in disarray, all of which he thought were signs of a possible struggle. There was water on the driveway, and it appeared to the deputy that the driveway had been hosed down. The deputy saw a bloody handprint on a tree and noticed blood splatter in various locations, including on Rintalan's motorcycle, his helmet, the ground near the garage, an old barrel, a wagon wheel, and a shard of glass.

On April 3, someone found Rintalan's decomposing body down an embankment near a road in Wrightwood. The body was located approximately 24 miles from Barnes's property, and two-tenths of a mile from Jeanne's sister's house. Rintalan's body was covered with a shower curtain that Barnes had been using to cover a sofa in her barn.

An autopsy of Rintalan's badly decomposed body revealed that Rintalan had been shot in his pelvic area, around his buttocks. His head had been

wrapped with duct tape and plastic. One of Rintalan's fingers was broken, and he had a large fracture along the base of his skull. The pathologist concluded that the bullet wound had likely not been fatal, although it could have been fatal depending on the amount of bleeding that occurred. The skull fracture would have caused unconsciousness and could have been fatal. The pathologist expressed the opinion that if Rintalan was alive when the duct tape was applied, he would have suffocated within a matter of minutes, and that this was the probable cause of death. Blunt force trauma was a contributing cause, and could have been the actual cause of death. The gunshot wound was also considered to be a contributing cause. The pathologist found that there was methamphetamine and alcohol in Rintalan's system.

On April 13, police in Havasu City, Arizona, pulled over defendants and impounded their vehicle. During a search of the vehicle, police found a .357 Magnum revolver in the engine compartment under the hood of the car.

Blood samples taken from the driveway and backyard of Barnes's property contained Rintalan's DNA. Rintalan's blood was found on the .357 Magnum, as well as in the trunk of defendants' car. In addition, there was DNA on the gun that was consistent with Rintalan's DNA. Both John and Jeanne's DNA was also found on the gun.

### 2. *The defense case*

John testified that between 1990 and 2005 he had been a member of the Vagos. At one point, he had served as vice-president. The Vagos is a rival of the Hell's Angels.

According to John, Jeanne and Barnes had been friends for "a while," and he and Jeanne moved into the guesthouse on Barnes's property around October 2006. John said that Barnes and Rintalan argued all the time and did not get along. John said that he and Rintalan got along generally, but began to have some disagreements about four or five weeks before Rintalan's death. The disagreements stemmed from the fact that Rintalan wanted John and Jeanne to pay their rent money to him, rather than to Barnes. John told Rintalan that he would not give the rent money to Rintalan because he and Jeanne were renting from Barnes. Rintalan was upset, but, initially, did not become violent. In the weeks that followed, however, Rintalan would swear at John and Jeanne, and threaten them.

On the evening of March 13, Rintalan knocked on the door of the guesthouse and asked to speak with John outside. Rintalan asked John for the rent money. They argued, and Rintalan punched John in the face. John tried to fight back, but Rintalan was stronger and kept knocking John to the ground. John did manage to knock Rintalan to the ground a couple of times.

At some point, John pushed Rintalan off of him and went into the guesthouse to get his gun. John came back outside, stood 50 to 75 feet away from Rintalan, and pointed the gun at him, to scare him. John froze, and did not fire the gun. According to John, Rintalan grabbed John's hand and the gun. The gun fired and struck John in the leg. The men struggled and fell to the ground, and the gun fired again. Rintalan yelled out in pain. John maintained that he had not shot Rintalan but, rather, that Rintalan's hand had been on the trigger and that both men were holding the gun when it fired.

The men continued to fight, and John struck Rintalan in the head with the gun, rendering him unconscious. John put away his gun and bandaged his leg. Rintalan then sat up and yelled for help. John got some duct tape and wrapped the tape around Rintalan's mouth because he "got tired of [Rintalan] screaming at [him]."

John panicked and dragged Rintalan to John's car. Rintalan was still fighting as John dragged him to the car. John wrapped Rintalan in a shower curtain, and put him in the trunk. John thought he could hear Rintalan breathing and gurgling as John placed him in the trunk.

John drove away from the property with Rintalan in the trunk. When John stopped in Wrightwood, he lifted Rintalan out of the trunk. John gave conflicting testimony about Rintalan's state at the time John lifted him out of the trunk. At one point, John said that he could hear Rintalan breathing and he thought that Rintalan was unconscious. However, John also stated that he was not sure whether Rintalan was dead when he removed Rintalan from the trunk.

John claimed that he had not intended to kill Rintalan, but instead, that he had just wanted to get Rintalan away from him. According to John, Jeanne had passed out earlier that evening from drinking. He said that she had not helped him either during the fight or in disposing of Rintalan's body. He also denied that Jeanne was the woman who told the neighbor that Rintalan was shooting at squirrels. According to John, after he dumped Rintalan's body, he returned home and awakened Jeanne to tell her what had happened. They immediately packed up their belongings and left.

B. *Procedural background*

On April 24, 2008, the San Bernardino County District Attorney filed an information charging John and Jeanne with murder (Pen. Code, § 187,

subd. (a)).[4] The information also alleged that both John and Jeanne personally discharged a firearm causing death or great bodily injury (§ 12022.53, subds. (b)–(e)(1)).[5]

A jury found defendants guilty of first degree murder. The jury also found the firearm enhancement to be true as to John.

The trial court sentenced John to a prison term of 50 years to life, and sentenced Jeanne to a term of 25 years to life.

Both defendants filed timely notices of appeal.

## III.

## DISCUSSION

A. *The trial court did not err in instructing the jury on an alternative theory of felony murder*

John contends that his conviction for first degree murder must be reversed because the trial court erred in providing the jury with an instruction on an alternative theory of felony murder which, John maintains, was "legally inadequate."

### 1. *Additional background*

During trial, the court and counsel discussed whether the court should instruct the jury on felony murder based on the underlying felony of kidnapping. The court and all counsel agreed that the state of the evidence could support a finding that John knew that Rintalan was alive at the time he put Rintalan in the trunk. The prosecutor pointed out that the evidence also could support a finding that Rintalan was alive when John removed him from the trunk. Defense counsel said that he could not recall testimony to that effect, and the court and the parties agreed to revisit the matter at a later time.

When the court and counsel addressed the issue again, they discussed whether the evidence could support a finding that John harbored multiple intents, or rather, whether the evidence supported only a finding that the kidnapping was incidental to the killing, in that John's intent in dumping Rintalan's body was only to dispose of evidence and to avoid detection. The

---

[4] Further statutory references are to the Penal Code unless otherwise indicated.

[5] The prosecution eventually moved to dismiss the personal firearm enhancement as to Jeanne, and the court granted the motion.

trial court ultimately determined that the jury could find that John had independent, but concurrent, intents and therefore, instructed the jury on both felony murder and premeditated murder.

### 2. *Legal standards pertaining to felony murder*

■ All murder that is committed in the perpetration of, or attempt to perpetrate, certain enumerated felonies, including kidnapping, is murder of the first degree. (§ 189.) "For felony murder, the required mental state is the specific intent to commit the underlying felony. [Citation.] The killing is considered to be committed in the perpetration of the underlying felony if the acts were part of a continuous transaction. [Citation.]" (*People v. Booker* (2011) 51 Cal.4th 141, 175 [119 Cal.Rptr.3d 722, 245 P.3d 366].)

"Under the felony-murder rule, 'the evidence must establish that the defendant harbored the felonious intent either prior to or during the commission of the acts which resulted in the victim's death . . . .' [Citation.]" (*People v. Ainsworth* (1988) 45 Cal.3d 984, 1016 [248 Cal.Rptr. 568, 755 P.2d 1017].)

### 3. *Analysis*

John contends that the evidence demonstrates that Rintalan was mortally wounded before John put him in the trunk of the car, and thus, that there is "no legal support for the theory that [Rintalan] was killed *during* the commission of a kidnapping." John contends that for this reason, the trial court erred in instructing the jury on felony murder based on kidnapping. We conclude that the trial court did not err in instructing the jury on felony murder based on kidnapping.

Based on the evidence presented, the jury could have reasonably inferred that John in fact formed the intent to kidnap Rintalan prior to committing the act or acts that resulted in Rintalan's death. First, John testified that he did not intend to kill Rintalan, but wanted only to get Rintalan away from him. The jury could have believed that John formed his plan to remove Rintalan from the property during the initial struggle between Rintalan and John. In addition, the jury could have concluded that the evidence demonstrated that John formed the intent to kidnap Rintalan after shooting him and hitting him on the head, that John placed the duct tape on Rintalan's head only after having formed this intent, and that Rintalan died as a result of asphyxiation from the duct taping.

There was also evidence from which the jury could have inferred that John placed the plastic and more duct tape around Rintalan's head after they

arrived in Wrightwood. John testified that he did not recall putting anything plastic on Rintalan's head while they were on Barnes's property. John also testified at one point that he believed Rintalan was still alive at the time he placed Rintalan in the trunk, and that Rintalan may have been alive when he removed him from the trunk.[6] Based on this evidence, the jury could have concluded that John placed the plastic and more duct tape on Rintalan's head after taking him out of the trunk, and could have further concluded that the duct tape and the plastic wrapped around Rintalan's head was what ultimately killed him.

In sum, felony murder was not, as John contends, a legally invalid theory of first degree murder in this case. Rather, the state of the evidence was such that the trial court did not err in instructing the jury on felony murder.

B. *The trial court did not err in allowing the prosecutor to present evidence of John's affiliation with the Vagos*

John contends that the trial court violated his rights to due process and to a fair trial when it allowed the prosecutor to present evidence of his affiliation with the Vagos.

1. *Additional background*

At the beginning of trial, the attorneys discussed whether the prosecutor intended to introduce evidence of John's affiliation with the Vagos. The prosecutor indicated that he wanted to use this evidence to connect John with the personal property that was left behind in a storage container at Barnes's property. Jeanne's counsel objected, pursuant to Evidence Code section 352, that the evidence would be more prejudicial than probative in that it had little relevance and was highly inflammatory.

The trial court ruled that the Vagos evidence would become relevant only if ownership of the property was a contested issue. The court directed the attorneys not to mention any gang affiliation, but indicated that the court might change its ruling at a later time based on other evidence presented.

During Lee's testimony, Jeanne's attorney asked Lee about Lee's statement to police that on the night that Rintalan disappeared, that Jeanne told Barnes and Lee that that "some Mexicans" had taken Rintalan. Counsel asked Lee whether she had told the detective about Jeanne's statement during her initial interview. Lee replied that she believed she had told the detective about the

---

[6] At another point in his testimony, John said that he was not sure whether Rintalan was dead at the time John removed him from the trunk. However, the jury could have believed that Rintalan was alive at that time based on other testimony that John gave.

statement. Later, the prosecutor asked Lee whether she had told the detective everything she knew during that first interview, or rather, had withheld anything. Lee said that she believed she had told the detective everything and had not withheld anything. The prosecutor asked Lee whether, when she was later interviewed by other detectives, she had provided additional information. Lee replied that she could not recall. The prosecutor then asked Lee whether she recalled telling the other detectives why she might have originally withheld information.

At this point, defense counsel requested a sidebar conference. The court granted the request, and the court and attorneys discussed defense counsel's intention to ask the detective who conducted the initial interview of Lee whether Lee had told him about Jeanne's statement to the effect that Mexicans had taken Rintalan, because that information was not in the detective's report. The prosecutor said that he understood that Lee had not told the first detective about Jeanne's statement, and that when she was later confronted with the fact she had not given that information to the first detective, Lee explained that the reason she had withheld the information was that she was afraid of John and Jeanne because they "were Vagos."

The trial court indicated that if it came out in the evidence that Lee had not told the first detective about Jeanne's statement, then the court would probably allow the prosecutor to elicit Lee's explanation as to why she had not done so—i.e., because she was afraid due to defendants' affiliation with the Vagos.

The court and counsel discussed the matter further, and the prosecutor later filed a bench brief addressing the issue. The trial court then held a hearing pursuant to Evidence Code section 402 on the issue. At the hearing, Lee testified that she had told a detective that she was afraid of defendants because they were in the Vagos. Lee said that she was afraid she would be killed. After the hearing, the trial court ruled that the prosecutor would be permitted to ask Lee whether she was afraid of defendants and if so, why, because that evidence went to Lee's credibility. The court also found that the evidence was admissible under Evidence Code section 1103, subdivision (b).[7]

When the trial resumed, Lee testified that she told a detective who interviewed her sometime after her initial interview that she had not provided

---

[7] Evidence Code section 1103, subdivision (b) provides: "In a criminal action, evidence of the defendant's character for violence or trait of character for violence (in the form of an opinion, evidence of reputation, or evidence of specific instances of conduct) is not made inadmissible by Section 1101 if the evidence is offered by the prosecution to prove conduct of the defendant in conformity with the character or trait of character and is offered after evidence that the victim had a character for violence or a trait of character tending to show violence has been adduced by the defendant under paragraph (1) of subdivision (a)."

all of the information that she had concerning the case during that first interview, and that the reason she had not done so was because she believed defendants were affiliated with the Vagos, and she feared for her safety. Lee testified that she still feared for her safety.

Later, during the defense case, John's attorney asked John whether he had been a member of the Vagos. John said that he had been a member and that he had eventually become vice-president of the club. He testified that the Vagos is a rival of the Hell's Angels. On cross-examination, John testified that he had been a member of the club between 1990 and 2005. He also provided testimony regarding the structure of the organization and its bylaws, as well as information concerning various items he owned that bore the Vagos name or insignia.

2. *Analysis*

John contends that the trial court abused its discretion in admitting evidence of his affiliation with the Vagos because the evidence was not relevant to show his character for violence, and was extremely inflammatory and prejudicial.

■ The trial court has broad discretion in decisions relating to the admission of evidence. We review the court's evidentiary decisions under the deferential abuse of discretion standard. (See, e.g., *People v. Thomas* (2011) 51 Cal.4th 449, 488 [121 Cal.Rptr.3d 521, 247 P.3d 886]; see also Evid. Code, § 352.) Evidence is relevant if it has any tendency in reason to prove or disprove a disputed fact. (Evid. Code, § 210.)

The trial court ruled that evidence pertaining to John's membership in the Vagos was admissible on two grounds—i.e., under Evidence Code section 1103, subdivision (b), and also with respect to Lee's credibility.

We need not determine whether the trial court abused its discretion in admitting the evidence pertaining to John's affiliation with the Vagos under Evidence Code section 1103, subdivision (b) because we conclude that the trial court did not abuse its discretion in allowing the prosecutor to elicit that information when the prosecutor asked Lee about her differing statements to detectives regarding whether Jeanne had told her that Mexicans had taken Rintalan. The defense opened the door to this evidence when it attempted to impeach Lee's testimony regarding Jeanne's statements by asking her questions about whether she had told the detective who initially interviewed her everything that she knew and had not withheld anything. Defense counsel asked this question knowing that Lee had later admitted having withheld information from the first detective as to what Jeanne had said on the night of

the incident. This cross-examination of Lee clearly placed her credibility at issue. Evidence that tended to explain Lee's failure to be completely forthcoming during her initial interview was therefore relevant to assessing her credibility.

The trial court could reasonably have concluded that permitting Lee to testify to the basis of her fear was more probative than prejudicial under Evidence Code section 352. Specifically, this information was clearly probative as to why Lee may not have told the detective everything that she knew during her initial interview. We conclude that the trial court did not abuse its discretion in permitting the prosecutor to elicit testimony from Lee as to why she had not provided all of the information that she had about the case during her initial interview.

After Lee brought up the possibility that John was affiliated with the Vagos, it was defense counsel who proceeded to ask John a number of additional questions about the Vagos and his affiliation with it. Once John took the stand, he placed his credibility in issue. Based on John's testimony that he was no longer a Vagos member, the trial court permitted the prosecutor to question John further about his relationship to the Vagos. The court limited the scope of the prosecutor's inquiry, and specifically did not allow the prosecutor to ask any questions about possible crimes in which the Vagos may have been involved. In view of this chronology, we conclude that the trial court did not abuse its discretion under Evidence Code section 352 in allowing the prosecutor to question John about the Vagos. The testimony that the prosecutor elicited did not constitute extensive or inflammatory gang evidence, as John suggests.

C. *There is sufficient evidence to support a finding that John personally and intentionally discharged the gun and inflicted great bodily injury or death*

John contends that there is insufficient evidence to support the jury's finding that he personally and intentionally discharged a gun and inflicted great bodily injury or death. Specifically, John maintains that there is insufficient evidence that he *intentionally* discharged the gun.

In determining the sufficiency of the evidence to support a guilty verdict, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (*Jackson v. Virginia* (1979) 443 U.S. 307, 319 [61 L.Ed.2d 560, 99 S.Ct. 2781] (*Jackson*).) "[T]he court must review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial

evidence—that is, evidence which is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*People v. Johnson* (1980) 26 Cal.3d 557, 578 [162 Cal.Rptr. 431, 606 P.2d 738].) " 'Substantial evidence includes circumstantial evidence and any reasonable inferences drawn from that evidence. [Citation.]' [Citation.] We ' " 'presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence.' " [Citation.]' [Citation.]" (*People v. Clark* (2011) 52 Cal.4th 856, 943 [131 Cal.Rptr.3d 225, 261 P.3d 243].)

We review the sufficiency of the evidence to support an enhancement using the same standard that we apply to a conviction. (See *People v. Augborne* (2002) 104 Cal.App.4th 362, 371 [128 Cal.Rptr.2d 258].)

■ "Section 12022.53 sets forth the following escalating additional and consecutive penalties, beyond that imposed for the substantive crime, for use of a firearm in the commission of specified felonies . . . : a 10-year prison term for personal use of a firearm, even if the weapon is not operable or loaded (*id.*, subd. (b)); a 20-year term if the defendant 'personally and intentionally discharges a firearm' (*id.*, subd. (c)); and a 25-year-to-life term if the intentional discharge of the firearm causes 'great bodily injury' or 'death, to any person other than an accomplice' (*id.*, subd. (d))." (*People v. Gonzalez* (2008) 43 Cal.4th 1118, 1124 [77 Cal.Rptr.3d 569, 184 P.3d 702].) The jury found that John personally and intentionally discharged a firearm, causing great bodily injury or death, pursuant to section 12022.53, subdivision (d).

John relies on his own testimony to support his claim that the evidence shows that Rintalan effectively shot himself during the struggle between John and Rintalan, and asserts that the prosecution offered no evidence to "contradict appellant's testimony that Rintalan essentially shot himself." However, John ignores the abundant circumstantial evidence, and the reasonable inferences that one could draw from this evidence, to support a finding that John intentionally shot Rintalan. The evidence demonstrated that the two men had an antagonistic relationship for some time prior to the incident, and that on the day of the incident, John and Rintalan engaged in a physical fight. John admitted that at some point during the fight, he managed to push Rintalan off of him, and went into the guesthouse to retrieve his gun. When a neighbor heard the men fighting and inquired about what was happening, a woman, whom the jury could have inferred was Jeanne, told the neighbor that Rintalan was shooting squirrels. It is clear that this explanation was false. In addition, rather than seeking help for Rintalan, John duct-taped Rintalan's mouth, dragged him to John's car, wrapped him in a shower curtain, and dumped him more than 20 miles away, on the side of the road. Although John claimed at trial that he had not purposely shot Rintalan, and instead,

maintained that he and Rintalan had been fighting over the gun when Rintalan somehow shot himself, viewing the evidence and the inferences that could be drawn from the evidence in the light most favorable to the prosecution, the jury could reasonably have rejected John's version of events and concluded that John had in fact intentionally shot Rintalan. There is thus sufficient evidence to support the jury's finding that John personally and intentionally discharged a gun and caused great bodily injury or death.

D. *Jeanne's attorney rendered ineffective assistance in failing to object to the "equally guilty" language in CALCRIM No. 400, as well as to the court's response to two jury questions pertaining to the mental state of an aider and abettor*

Jeanne contends that the trial court erred in instructing the jury with the version of CALCRIM No. 400 that was in effect at the time, which pertains to aiding and abetting liability. In a related contention, Jeanne argues that the trial court erred in responding to two questions that the jury submitted to the court during deliberations concerning whether an aider and abettor's intent is relevant in determining culpability.

1. *Additional background*

The trial court instructed the jury with CALCRIM No. 400 as follows: "A person may be guilty of a crime in two ways. One, he or she may have directly committed the crime. I will call that person the perpetrator. Two, he or she may have aided and abetted a perpetrator, who directly committed the crime. A person is equally guilty of the crime whether he or she committed it personally or aided and abetted the perpetrator who committed it . . . ."[8]

The court also instructed the jury with CALCRIM No. 401 as follows:

"To prove that the defendant Jeanne Loza is guilty of a crime based on aiding and abetting that crime, the People must prove that:

"1. The perpetrator committed the crime;

"2. The defendant knew that the perpetrator intended to commit the crime;

"3. Before or during the commission of the crime, the defendant intended to aid and abet the perpetrator in committing the crime;

---

[8] CALCRIM No. 400 has since been amended to remove the word "equally" before the word "guilty" from this portion of the instruction, so that the instruction now reads: "A person is guilty of a crime whether he or she committed it personally or aided and abetted the perpetrator." (Judicial Council of Cal., Crim. Jury Instns. (2011) p. 167.)

"AND

"4. The defendant's words or conduct did in fact aid and abet the perpetrator's commission of the crime.

"Someone *aids and abets* a crime if he or she knows of the perpetrator's unlawful purpose and he or she specifically intends to, and does in fact, aid, facilitate, promote, encourage, or instigate the perpetrator's commission of that crime.

"If all of these requirements are proved, the defendant does not need to actually have been present when the crime was committed to be guilty as an aider and abettor.

"If you conclude that defendant was present at the scene of the crime or failed to prevent the crime, you may consider that fact in determining whether the defendant was an aider and abettor. However the fact that a person is present at the scene of a crime or fails to prevent the crime does not, by itself, make him or her an aider and abettor."

During deliberations, the jury sent the court a note that read as follows: "Concerning aiding + abetting does the state of mind of the aider and abettor need/should be considered? If the person aids and abets because they are worried about an attack from the perp[e]trator does tha[t] make a difference when considering the degrees of murder[?]"

The trial court discussed with counsel how to respond to the jury's inquiry. Jeanne's attorney suggested that the court could respond to the first question by "either refer[ring] them to the instructions or just say 'yes.' " The court and attorneys discussed that the second question was a factual question, not a legal one. After further discussion about how to respond to the jury's note, everyone agreed that the court should respond by saying, " 'You must apply the evidence to the law as you have been instructed.' " The court provided this response to the jury, and the jury did not seek further clarification. Later that day, the jury informed the court that it had reached a verdict.

2. *Analysis*

As an initial matter, the People contend that Jeanne has either forfeited these contentions by failing to object to the court's instructions, or that she invited the error with respect to how the court responded to the jury's questions.

■ "Generally, a person who is found to have aided another person to commit a crime is 'equally guilty' of that crime." (*People v. Lopez* (2011) 198

Cal.App.4th 1106, 1118 [131 Cal.Rptr.3d 467] (*Lopez*), italics omitted, citing § 31 and 1 Witkin & Epstein, Cal. Criminal Law (3d ed. 2000) Introduction to Crimes, § 77, pp. 122–123.) Because it is generally true that an aider and abettor is as equally guilty as the direct perpetrator of a crime, the instruction that the court gave was generally accurate. (See *People v. Samaniego* (2009) 172 Cal.App.4th 1148, 1163 [91 Cal.Rptr.3d 874] (*Samaniego*).) Given that the instruction was generally accurate, but potentially incomplete in this case since there was evidence from which the jury could have concluded that Jeanne had a mental state different from John's with respect to Rintalan's killing, it was incumbent on Jeanne to request a modification if she thought that the general instruction would be misleading under the circumstances of this case. By failing to request a modified instruction, Jeanne has forfeited this claim. (See *Lopez, supra*, at p. 1118; see also *Samaniego, supra*, at p. 1163 [because CALCRIM No. 400 is generally an accurate statement of the law with respect to an aider and abettor being "equally guilty," defendant was obligated to request modification or clarification].)

With respect to the trial court's response to the jury's questions, Jeanne's attorney agreed with the response that the court gave to the questions concerning whether the jury was to consider the mental state of an aider and abettor. Jeanne has thus also forfeited her contention that the trial court's response to the jury's questions on this point was erroneous. (See *People v. Castaneda* (2011) 51 Cal.4th 1292, 1352 [127 Cal.Rptr.3d 200, 254 P.3d 249].)

### a. *Jeanne's attorney rendered ineffective assistance*

Jeanne contends, in the alternative, that her attorney rendered ineffective assistance in failing to seek modification of CALCRIM No. 400 and in failing to object to the court's response to the jury's questions concerning aiding and abetting.

■ "An appellant claiming ineffective assistance of counsel has the burden to show: (1) counsel's performance was deficient, falling below an objective standard of reasonableness under prevailing professional norms; and (2) the deficient performance resulted in prejudice. [Citations.] . . . [¶] To establish prejudice, '[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.' [Citations.] 'A reasonable probability is a probability sufficient to undermine confidence in the outcome.' [Citation.] In demonstrating prejudice, the appellant 'must carry his burden of proving prejudice as a "demonstrable reality," not simply speculation as to the effect of the errors or omissions of counsel.' [Citation.]" (*People v. Montoya* (2007) 149 Cal.App.4th 1139, 1146–1147 [57 Cal.Rptr.3d 770] (*Montoya*).)

"In determining whether counsel's performance was deficient, we exercise deferential scrutiny. [Citations.] The appellant must affirmatively show counsel's deficiency involved a crucial issue and cannot be explained on the basis of any knowledgeable choice of tactics. [Citation.] [¶] Our Supreme Court recently reiterated the obligations of appellate courts in reviewing claims of ineffective assistance of counsel: ' " 'Reviewing courts defer to counsel's reasonable tactical decisions in examining a claim of ineffective assistance of counsel [citation], and there is a "strong presumption that counsel's conduct falls within the wide range of professional assistance." ' [Citation.] '[W]e accord great deference to counsel's tactical decisions' [citation], and we have explained that 'courts should not second-guess reasonable, if difficult, tactical decisions in the harsh light of hindsight' [citation]. 'Tactical errors are generally not deemed reversible, and counsel's decisionmaking must be evaluated in the context of the available facts.' [Citation.]" ' [Citation.]" (*Montoya, supra,* 149 Cal.App.4th at p. 1147.)

■ Although it is generally true that "a person who is found to have aided another person to commit a crime is 'equally guilty' of that crime" (*Lopez, supra,* 198 Cal.App.4th at p. 1118), "in certain cases, an aider may be found guilty of a greater or lesser crime than the perpetrator. [Citations.]" (*Ibid.*) The California Supreme Court has stated that an aider and abettor may be guilty of greater homicide-related offenses than those the actual perpetrator committed. (See *People v. McCoy* (2001) 25 Cal.4th 1111 [108 Cal.Rptr.2d 188, 24 P.3d 1210] (*McCoy*).) Although the Supreme Court has not expressly addressed whether an aider and abettor may also be guilty of a lesser homicide-related offense than the offense the actual perpetrator committed, at least two appellate courts have reached this conclusion based on language in *McCoy.* (See *People v. Nero* (2010) 181 Cal.App.4th 504, 513–518 [104 Cal.Rptr.3d 616] (*Nero*); *Samaniego, supra,* 172 Cal.App.4th at pp. 1164–1165 ["Though *McCoy* concluded that an aider and abettor could be guilty of a greater offense than the direct perpetrator, its reasoning leads inexorably to the further conclusion that an aider and abettor's guilt may also be less than the perpetrator's, if the aider and abettor has a less culpable mental state."].) As the *Nero* court explained, the *McCoy* court indicated a number of times "that an aider and abettor's mens rea is personal, that it may be different than the direct perpetrator's: 'guilt is based on a combination of the direct perpetrator's acts and the aider and abettor's own acts and own mental state' [citation]; an aider and abettor's 'mental state is her own; she is liable for her mens rea, not the other person's' [citation]; aider and abettor liability is 'premised on the combined acts of all the principals, but on the aider and abettor's own mens rea' [citation]." (*Nero, supra,* at p. 514, italics omitted.)

Because an aider and abettor's mental state "floats free" from that of the direct perpetrator's, at least two courts have concluded that in certain circumstances, the "equally guilty" language found in CALCRIM No. 400

(and similar language previously found in CALJIC No. 3.00), can be misleading by suggesting to the jury that it may not find an aider and abettor to be guilty of a lesser offense from that of the direct perpetrator. (See *Nero, supra*, 181 Cal.App.4th at p. 518; *Samaniego, supra*, 172 Cal.App.4th at p. 1165.)

Although the court in *Samaniego* found that under the circumstances of that case, the trial court's instructing the jury with CALCRIM No. 400, and in particular, its use of the "equally guilty" language, was error, the court concluded that in view of other instructions that the trial court had provided, and the jury's findings, the jury had necessarily determined that the defendant had acted with premeditation and deliberation in aiding and abetting a murder. (*Samaniego, supra*, 172 Cal.App.4th at p. 1165.) If this case had involved only the court's instructing the jury with the "equally guilty" language from former CALCRIM No. 400, we might have followed the *Samaniego* court's analysis and concluded that any error in the court's use of the "equally guilty" language was harmless. However, this case is distinguishable from *Samaniego* in that the jury specifically inquired whether it was required to, or should, consider the state of mind of an aider and abettor, and asked a question that indicated that the jury believed Jeanne may have been less culpable than the direct perpetrator, and the trial court failed to provide the jury with an adequate response to the jury's questions.

The facts in this case are similar to those in *Nero, supra*, 181 Cal.App.4th 504. In *Nero*, the prosecution's theory of liability was that the defendant aided and abetted in a murder by handing her brother a knife. (*Id.* at p. 510.) The trial court in *Nero* instructed the jury on first and second degree murder, and voluntary manslaughter (*ibid.*), and also instructed the jury with CALJIC No. 3.00, which included "equally guilty" language similar to the language in the instruction that the court gave in this case.[9] In addition, the trial court instructed the jury with CALJIC No. 3.01, which is similar to CALCRIM No. 401, the specific instruction on the elements of aiding and abetting that the trial court gave in this case.[10]

---

[9] The CALJIC No. 3.00 instruction given in *Nero* was as follows: " 'Persons who are involved in committing or attempting to commit a crime are referred to as principals in that crime. Each principal, regardless of the extent or manner of participation, is equally guilty. Principals include those who directly and actively commit or attempt to commit the acts constituting the crime, or, two, those who aid and abet the commission or attempted commission of a crime.' " (*Nero, supra*, 181 Cal.App.4th at p. 510, italics omitted.)

[10] The trial court in *Nero* instructed with CALJIC No. 3.01 as follows: " 'A person aids and abets the commission or attempted commission of a crime when he or she, one, with knowledge of the unlawful purpose of the perpetrator, and, two, with the intent or purpose of committing or encouraging or facilitating the commission of the crime, and, three, by act or advice aids and abets, promotes, encourages, or instigates the commission of the crime. [¶] A person who aids and abets the commission or attempted commission of a crime need not be

In *Nero,* during deliberations, the jury sent a note to the court that read: " 'If Brown is an "aid[] + abet" must she [receive] [the] same level of guilt (or innocence) as Mr. Nero? Can she [receive] a higher or lesser degree of murder, manslaughter, or innocence?' " (*Nero, supra,* 181 Cal.App.4th at p. 511.) The trial court initially provided the following response: " 'The same standard of proof applies to both defendants. What is proven must be proven beyond a reasonable doubt in order to have a conviction. [¶] If the proof fails to reach the standard of beyond a reasonable doubt, either one or both of the defendants are entitled to a verdict of not guilty. [¶] Now for that part of the question, [is] that explanation satisfactory, Mr. Foreman?' " (*Ibid.*) The court, the jury foreperson and another juror then engaged in a colloquy during which it became apparent that the court's initial response had not answered the jury's question. The foreperson explained, " 'We have come to a consensus as [*sic*] agree to the culpability for one of the defendants, and we are just concerned that, does the other defendant must [*sic*] receive the same level of culpability, either guilt or innocence, without tipping our hand too much?' " (*Ibid.*) The foreperson further explained, " 'So, for example, hypothetically, if I may, sir, defendant A, for example, defendant A, we decide they're guilty in the second degree, just for an example, would the person that we have decided guilty of aiding and abetting, would they also be guilty on the second degree, or could they be held to the level of the manslaughter, or completely innocent?' " (*Ibid.*)

The trial court responded, " 'In talking to the lawyers, let me simply say, the aider and abett[o]r can be no more responsible—they are both considered principals, but the person who is the aider and abett[o]r can bear no greater responsibility as far as the degree.' " The foreperson then asked, " '*Could they bear less responsibility*?' " The *Nero* trial court replied, " 'You might conclude that the person who is the aider and abett[o]r—is allegedly the aider and abett[o]r—is not guilty.' " (*Nero, supra,* 181 Cal.App.4th at p. 511, original italics.) Another juror then spoke up and said, "I think our problem is we have made a decision about aiding and abetting, but we are concerned about the level of—*given that the defendant would be guilty of aiding and abetting the crime, do they have to have the same—does it have to be of the same level, murder two or manslaughter, or could they be at a lower level? Or you said it can't be the higher level, but could they be at [the] lower level*?" (*Id.* at p. 512, original italics.)

The trial court indicated that it wanted to discuss the matter with the attorneys, but before doing so, the court reread CALJIC Nos. 3.00 and 3.01 to

present at the scene of the crime. [¶] Mere presence at the scene of a crime which does not itself assist the commission of the crime does not amount to aiding and abetting. [¶] Mere knowledge that a crime is being committed and the failure to prevent it does not amount to aiding or abetting.' " (*Nero, supra,* 181 Cal.App.4th at p. 510, fn. 12.)

the jury, which included the statement in CALJIC No. 3.00 that " '[e]ach principal . . . is equally guilty.' " (*Ibid.*) After rereading the instruction, the court asked the jurors whether rereading the two instructions had been helpful, and at least two jurors responded in the affirmative. The court then said, " 'I thought they might. So what I am going to say to you . . . in answer, without consulting the attorneys—I have to be careful about that—going to the crime, regarding principals: [¶] Each—and I am picking up the language here—*Persons who are involved in the committing or attempting to commit a crime are referred to as principals in that crime. Each principal, regardless of the extent or manner of the participation, is equally guilty.* Principals include those who directly and actively attempt to commit or commit the act constituting the crime, and . . . those who aid and abet in its commission. [¶] So if that's helpful for you. I will ask you to return to the jury room and do whatever work you can do.' " (*Nero, supra,* 181 Cal.App.4th at pp. 512–513, original italics.) The following morning, the jury returned verdicts finding both defendants guilty of second degree murder. (*Id.* at p. 513.)

In analyzing the trial court's instructions to the jury, the appellate court in *Nero* explained that an aider and abettor's mens rea "floats free" from the mens rea of the direct perpetrator (*Nero, supra,* 181 Cal.App.4th at pp. 515–518), i.e., the jury must determine what the aider and abettor's intent was, separate from that of the perpetrator. Because this is what the law requires, the *Nero* court concluded that "even in unexceptional circumstances CALJIC No. 3.00 and CALCRIM No. 400 can be misleading." (*Nero, supra,* at p. 518.) The *Nero* court noted that despite having been properly instructed on aiding and abetting, including being instructed as to the specific intent necessary for each of the crimes (which, the *Nero* court acknowledged, should have suggested to the jury that the accused aider and abettor's mental state "was not tied to Nero's"), the jury "still asked if they could find Brown, as an aider and abettor, guilty of a greater or lesser offense than Nero." (*Ibid.*)

█ Based on the jury's clear confusion in that case, the *Nero* court concluded that "the aider and abettor instructions—namely, CALJIC No. 3.00—are confusing and should be modified." (*Nero, supra,* 181 Cal.App.4th at p. 518.) The *Nero* court held, "[W]here, as here, the jury asks the specific question whether an aider and abettor may be guilty of a lesser offense, the proper answer is 'yes,' she can be. The trial court, however, by twice rereading CALJIC No. 3.00 in response to the jury's question, misinstructed the jury." (*Nero, supra,* at p. 518.)

█ The trial court in the present case similarly misinstructed the jury. Although generally "[j]urors are presumed able to understand and correlate instructions and are further presumed to have followed the court's instructions" (*People v. Sanchez* (2001) 26 Cal.4th 834, 852 [111 Cal.Rptr.2d 129,

29 P.3d 209]), the jury's questions *demonstrate that the jury did not understand that the prosecution had to prove Jeanne's intent as an aider and abettor.* By asking whether it was required to or should consider the state of mind of the aider and abettor, the jury clearly indicated that it had not understood, from the instructions that the court had already provided, that it had to determine Jeanne's intent as to each offense she was accused of aiding and abetting.

Thus, although the jury's questions in this case were not as pointed as the jury's questions in *Nero*, like the questions posed by the *Nero* jury, the questions this jury asked indicated that despite having been provided instructions from which they should have understood that they were required to consider the intent of the person accused of aiding and abetting the perpetrator, the jury remained confused as to this issue. The trial court's response failed to address the jury's obvious confusion, and instead, simply directed the jury to return to the instructions that the court had previously given, and to apply the law to those instructions.

■ Section 1138 requires the trial court to provide the jury with "any desired information 'on any point of law arising in the case,' " and thereby creates a " 'mandatory' duty to clear up any instructional confusion expressed by the jury." (*People v. Gonzalez* (1990) 51 Cal.3d 1179, 1212 [275 Cal.Rptr. 729, 800 P.2d 1159], superseded by statute on another ground.) Because it was clear from the jury's questions that the instructions that the court had already given had left the jurors confused, it was not enough for the court to inform the jurors, in response to their specific inquiry, that they must rely on the very instructions that had confused them. Despite the mandate of section 1138, the trial court failed to clarify for the jury not only that it was required to consider an aider and abettor's mens rea, but that mens rea is personal to the aider and abettor and is not tied to the mens rea of the direct perpetrator.

■ We conclude that Jeanne's counsel should have objected to the trial court's use of the "equally guilty" language in CALCRIM No. 400, and should also have objected to the court's proposed response to the jury's questions with respect to its consideration of the aider and abettor's intent. There is no doubt that Jeanne's state of mind was a crucial issue in this case. Counsel's failure to ensure that the jury was properly informed that it was required to determine the intent of an aider and abettor separately from that of the perpetrator cannot reasonably be deemed to have been a tactical error. We are unable to ascertain any satisfactory explanation as to why counsel would fail to ensure that the jury was adequately instructed on the issue of intent for purposes of aiding and abetting. Because counsel's failure to object cannot be regarded as a tactical error, we consider whether Jeanne has demonstrated that there is a reasonable probability that, but for counsel's

error, the result of her trial could have been different. Again, " '[a] reasonable probability is a probability sufficient to undermine confidence in the outcome.' [Citation.]" (*Montoya, supra*, 149 Cal.App.4th at p. 1147.)

### b. *There is a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different*

We conclude that there is a reasonable probability that if the jury had been correctly instructed that it was required to consider an accused aider and abettor's intent, rather than being directed back to the instructions that the court had already provided—instructions that included CALCRIM No. 400, which informed the jury that an aider and abettor and a perpetrator were "equally guilty"—the jury might have reached a different verdict with respect to Jeanne. The jury's questions indicated that it may not have considered Jeanne's intent at all in finding her guilty of first degree murder under an aiding and abetting theory. It is possible that the jury instead believed that Jeanne assisted John in some way during the incident, and was under the impression that her assistance, *even in the absence of a specific intent to aid and abet a first degree murder*, was sufficient to subject her to culpability for the crime that the jury found John had committed. The error in this case is particularly troubling given the state of the evidence against Jeanne, virtually all of which was circumstantial and speculative. Although there was sufficient evidence from which the jury could have found Jeanne guilty of first degree murder, as we describe in part III.F., *post*, this does not mean that the state of the evidence overwhelmingly established Jeanne's culpability for that offense. On the contrary, the evidence that Jeanne aided and abetted *premeditated* murder was fairly weak. The evidence that Jeanne aided and abetted in Rintalan's kidnapping was even weaker.

Moreover, the jury's questions indicated that if it had been properly instructed, it may have considered a verdict other than first degree murder for Jeanne. In particular, the jury's second question about the aider and abettor being worried about an attack by the "perpetrator"[11] indicated that if the jury had been properly instructed that an aider and abettor's guilt must be based on his or her personal state of mind, the jury might have considered Jeanne to have been guilty of an offense less serious than first degree murder. Although the trial court's response to the jury's questions in this case was not as misguided as the trial court's response in *Nero* in that in the present case the court did not *expressly* repeat the "equally guilty" language to the jury, the court's failure to adequately respond to the jury's questions, which indicated the jury's confusion with respect to an element of the offense, and its

---

[11] The jury's reference to the "perpetrator" in this question is odd since there was no evidence that Jeanne had been frightened of the *perpetrator*, John. Instead, the evidence at trial suggested that Jeanne and John were fearful of the *victim*, Rintalan.

statement that the jury was to look to the instructions that the court had previously given, essentially directed the jury to return to the "equally guilty" language in CALCRIM No. 400.

If the trial court had responded to the jury's questions by informing the jury not only that it must consider the intent of a defendant accused of aiding and abetting, but also that an aider and abettor's culpability is based on his or her personal intent and is not tied to the intent of the direct perpetrator, there is a reasonable probability that the jury might have a returned a different verdict with respect to Jeanne. Jeanne has thus demonstrated that there is a reasonable probability that, but for her attorney's failure to object to the court's instructions to the jury and to request an adequate response to the jury's questions about the instructions, the result of the proceeding would have been different. For this reason, we reverse Jeanne's conviction for first degree murder.[12]

E. *The trial court's response to the jury's questions about kidnapping was adequate*

Jeanne contends that the trial court erred in responding to two questions that the jury posed concerning whether a person must be alive in order to be kidnapped. According to Jeanne, the court's inadequate response left the jury without the specific guidance that it was requesting, and resulted in a denial of her rights to due process and to a fair trial.

During deliberations, the jury sent the following note to the trial court: "1. If the person is dead, is it consider[e]d kidnapping? Is it still kidnapping 'if' the person is dead?" After a telephonic discussion with all counsel about the jury's questions, the court provided the jury with the following response: "A person must be living to be kidnapped." According to a settled statement created for purposes of the appellate record, neither defense attorney objected to the court's response, and all of the attorneys were under the impression that the answer that the court gave would generally be helpful to the defense.

The People contend that Jeanne has forfeited this issue and/or that she invited the error as a result of trial counsel's agreement with the response that the court provided to the jury. In response, Jeanne argues that her attorney provided ineffective assistance of counsel in failing to object to the court's response. We agree that counsel's acquiescence to the court's proposed response forfeited the issue. We therefore consider whether Jeanne's attorney provided ineffective assistance by agreeing to the response that the court gave

---

[12] Because we conclude that there is sufficient evidence to support Jeanne's conviction for first degree murder, Jeanne may be retried on this charge.

to the jury's first note, i.e., "A person must be living to be kidnapped." In doing so, we apply the same standards for reviewing a claim of ineffective assistance of counsel that we set out in part III.D.2.a., *ante*.

As an initial matter, we address Jeanne's assertion that the jury was asking two different questions when it stated in its note, "If the person is dead, is it consider[e]d kidnapping? Is it still kidnapping 'if' the person is dead?" Jeanne contends that the second question is distinct from the first, and that what the jury must have been asking in its second question is, "what effect would appellant's belief that the victim was dead have on her culpability?" We find this interpretation of the jury's note to be unreasonable. We interpret the note precisely as the trial court and the trial attorneys understood it—i.e., as asking a single question, but phrasing that question in two different ways. The fact that the jury numbered the questions with a single "1." before both questions, as well as the fact that the jury never sought additional clarification once it received the court's response supports our conclusion that the jury was asking a single question phrased in two different ways. If, in asking, "Is it still kidnapping 'if' the person is dead?," the jury was inquiring what the effect would be if a defendant mistakenly believed that the victim was dead before moving the victim, the jury would not have been satisfied with the court's single response to both questions.

 We next conclude that Jeanne has not demonstrated that her attorney performed deficiently with respect to this issue. The trial court's response to the jury's inquiry concerning whether the victim must be alive to be kidnapped was a correct statement of the law, since a person must be living to be kidnapped. (See *People v. Hillhouse* (2002) 27 Cal.4th 469, 498 [117 Cal.Rptr.2d 45, 40 P.3d 754].) Jeanne argues that the court's answer was not responsive to the jury's question and was incorrect because, she contends, what matters for purposes of liability for aiding and abetting felony murder based on kidnapping is not whether the victim of the kidnapping was alive, but, rather, whether the aiding and abetting of the kidnapping occurred before or after the mortal wound was inflicted.

The court's answer was responsive to the jury's specific question, and was correct, whether one is discussing the direct offense of kidnapping . or kidnapping in the context of felony murder. In order for a defendant to be guilty of kidnapping *or* kidnapping in the context of a felony murder, the victim must have been alive at the time of the kidnapping. In other words, while the fact that the victim is alive at the time of the kidnapping may not be *sufficient* to establish liability for felony murder based on kidnapping, it is

clearly necessary.[13] The jury asked only whether the victim had to be alive in order to have been kidnapped, and did not ask whether the fact that the victim was alive would be sufficient to find the defendant guilty of felony murder based on kidnapping. The court provided a correct response to the question that the jury posed. It would have been inappropriate for the court to have answered a question that the jury did not ask. In addition, the court had previously instructed the jury that in order to find a defendant guilty of felony murder in the course of a kidnapping, the defendant had to have formed the intent to commit or aid and abet kidnapping before or at the time the mortal wound was inflicted. The jury was thus aware that the point in time when the mortal wound was inflicted was relevant to its determination of whether Jeanne could be found guilty of felony murder based on kidnapping. With all of this in mind, it is clear that the trial court provided an appropriate, legally correct response to the jury's question. The fact that defense counsel neither objected to, nor requested additional explanation of, the court's response to the jury's question cannot be deemed deficient performance. Jeanne's claim of ineffective assistance of counsel with respect to this issue thus fails.

F. *There is sufficient evidence to support Jeanne's conviction for first degree murder*

Jeanne contends that there is insufficient evidence to support her conviction for first degree murder. She asserts that the evidence is insufficient to support a finding that she was the perpetrator of, or an aider and abettor to, either felony murder or premeditated murder.

We apply the same standard of review as we described in part III.C., *ante*, to Jeanne's challenge to the sufficiency of the evidence. That is, we look to see "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (*Jackson, supra*, 443 U.S. at p. 319, italics omitted.) We conclude that there is sufficient evidence to support both theories of first degree murder as to Jeanne.

1. *There is sufficient evidence that Jeanne aided and abetted felony murder based on kidnapping*

The jury was instructed that it could find Jeanne guilty of felony murder if it found that she aided and abetted a kidnapping; that she intended to aid and abet the perpetrator in committing a kidnapping; that while the perpetrator

---

[13] The fact that the victim is alive at the time of a kidnapping may not be sufficient to establish liability for felony murder based on kidnapping because, as Jeanne points out, not only must the victim be alive, but the defendant must also have formed the intent to kidnap the victim before the mortal wound was inflicted.

was committing the kidnapping the perpetrator did an act that caused the death of another; and that there was a logical connection between the act causing death and the kidnapping. (See CALCRIM No. 540B.) There was sufficient circumstantial evidence presented at trial from which the jury could have concluded that Jeanne in fact aided and abetted John in kidnapping Rintalan, and that during the kidnapping, John caused Rintalan's death.

The prosecutor argued that John could not have lifted Rintalan into the trunk by himself, and that Jeanne must have helped him do so. There was evidence to support this theory, in that John testified that at the time of the incident he was 58 years old and was not in good shape. Rintalan was taller than John, and weighed more. In addition, during cross-examination, John began to answer a question in a manner that implicated another person. The prosecutor asked, "You said on direct examination that [Rintalan] was still breathing. Do you remember that?" John responded, "Yes, when *we* were— when I was first going to put him in the trunk." (Italics added.) In addition, John testified that he had never been to Jeanne's sister's house, and maintained that he had driven to Wrightwood despite having no particular destination in mind. However, the location where Rintalan's body was dumped was on the same road as Jeanne's sister's home, only two-tenths of a mile from her house. All of this constitutes circumstantial evidence from which the jury could have concluded that Jeanne helped John commit the kidnapping.

Jeanne maintains that there was insufficient evidence that she aided and abetted a kidnapping because the evidence showed either that Rintalan was dead before he was placed in the trunk, or that he was mortally wounded prior to being placed in the trunk to a degree that "any signs of life were minimal and barely perceptible." However, as we discussed in part III.A., *ante*, there was evidence from which the jury could have concluded that Rintalan was alive at the time he was placed in the trunk, that it was only after arriving in Wrightwood that John placed the plastic and more duct tape on Rintalan, and that it was this that caused Rintalan's death. For example, John testified that Rintalan was still fighting as John dragged him to the car and that he thought he heard Rintalan breathing and gurgling as John put him in the trunk. John also testified that he believed Rintalan was merely unconscious when John removed him from the trunk in Wrightwood. Viewing this evidence in the light most favorable to the prosecution, a reasonable trier of fact could have determined that Rintalan was alive when he was placed in the trunk, and that he was still alive when he was taken out of the trunk, and that he was mortally wounded after having been taken to Wrightwood. We therefore reject Jeanne's contention that there is insufficient evidence that she aided and abetting a kidnapping.

2. *There is sufficient evidence that Jeanne perpetrated or aided and abetted a premeditated murder*

Jeanne also argues that there is insufficient evidence that she perpetrated or aided and abetted in committing a premeditated murder. We disagree.

Some of the same evidence that could support a finding that Jeanne aided and abetted in the kidnapping of Rintalan could also support a finding that Jeanne aided and abetted a premeditated murder. There was circumstantial evidence that Jeanne helped John put Rintalan into the trunk of the car. John's apparently inadvertent reference to "we" during his testimony provided further evidence that Jeanne was involved. The jury could have determined that Rintalan was alive when he was placed in the trunk, and could have reasonably inferred that both defendants intended to kill Rintalan once they reached Wrightwood.

Alternatively, the jury could have believed that Jeanne aided and abetted a premeditated murder on Barnes's property. There was evidence that both John and Jeanne had been unhappy with Rintalan's behavior in the weeks leading up to this incident. The evidence also demonstrated that John waited until there was a break in his fight with Rintalan to go and retrieve a gun. John also took the time to obtain duct tape, and later, a shower curtain to wrap around Rintalan's body. The jury could have inferred that Jeanne was the woman who covered up the fact that John was fighting with Rintalan (and had shot Rintalan) by telling the neighbor that Rintalan was shooting at squirrels when the neighbor thought she heard a fight taking place on Barnes's property. The jury could have believed that Jeanne knew that John planned to kill Rintalan, and that she was helping cover up the murder by lying to the neighbor. The fact that after Rintalan had been dumped on the side of the road, Jeanne lied to Barnes and Lee by making up a story that Rintalan had gotten into a car with "some Mexicans" who dumped him along the highway, constitutes further evidence of her participation in a murder.

Although the evidence against Jeanne was circumstantial, it is sufficient to support a finding that Jeanne aided and abetted John in committing a premeditated murder.

G. *The "surprise" addition of a new theory murder, i.e., felony murder based on kidnapping, did not violate Jeanne's rights to due process and to a fair trial*

Jeanne contends that her rights to due process and to a fair trial were violated when John took the stand and provided unexpected testimony that opened the door for the prosecutor to allege felony murder based on kidnapping against both John and Jeanne.

### 1. *Additional background*

The prosecutor's theory of the murder of Rintalan at the preliminary hearing and during the case-in-chief was that John and Jeanne were both guilty of premeditated murder. Specifically, the prosecutor's theory was that John and Jeanne had killed Rintalan on the property and disposed of his body in Wrightwood. However, during John's defense testimony, John stated that he heard "some kind of gurgling sound, breathing" coming from Rintalan before he put Rintalan in the trunk of the car. John also testified that he heard Rintalan breathing when he removed Rintalan from the trunk.[14]

After hearing this testimony, before concluding his cross-examination of John, the prosecutor requested that the trial court instruct on felony murder based on the underlying felony of kidnapping. When John's attorney complained that felony murder was a last-minute theory and that giving the requested instruction would be unfair to defendants, the court noted that the prosecutor could not have anticipated how John was going to testify. The prosecutor confirmed that he had no way of knowing that John was going to testify that Rintalan was still alive when John placed him in the trunk of the car because John had invoked his right to remain silent at the time of his arrest and had made no previous statements.

During this discussion between the court and the attorneys, the court offered to give defense counsel time to prepare to deal with the felony murder theory. Neither defense attorney requested additional time. Jeanne's attorney did argue against instructing the jury on felony murder based on kidnapping, contending that any movement of Rintalan's body was incidental to an assault with a deadly weapon or a murder. Jeanne's counsel also argued that the felony-murder instruction should not apply to her because there was no evidence that she knew that there had been a kidnapping or that she had aided and abetting a kidnapping.

### 2. *Analysis*

Jeanne contends that she did not receive a fair trial because she did not have adequate notice of the charges against her. She acknowledges that "felony murder and premeditated murder are not distinct crimes [citation], that existing California law has held that a pleading charging murder as a Penal Code section 187, subdivision (a) violation is proper, and that a pleading charging murder need not specify which theory of murder [—including felony murder—] the prosecutor intends to rely on [citation] or the

---

[14] On cross-examination, John denied that he had earlier said that he heard Rintalan breathing when he took him out of the trunk. He did, however, acknowledge that he thought that Rintalan may have been unconscious at that time, although he also said that he thought Rintalan may have been dead.

degree. [Citation.]" Jeanne nevertheless contends that in some circumstances, an otherwise proper pleading will still fail to provide notice sufficient to satisfy due process requirements.

 Jeanne relies on multiple federal cases in which courts have found due process violations based on insufficient notice of the charges against a defendant. Jeanne cites *Gray v. Raines* (9th Cir. 1981) 662 F.2d 569, in which the court concluded that the defendant's due process rights had been violated where he had been charged solely with forcible rape, but was ultimately convicted of statutory rape, and the first notice the defendant received that he was going to be charged with statutory rape was during a jury instruction conference near the close of evidence. (*Id.* at p. 570.) Unlike the situation in this case, which involves a new *theory* of first degree murder, *Gray* involved a new *charge*. As Jeanne acknowledges, there is no requirement that a pleading that charges murder specify the *theory* of murder. (See *People v. Davis* (1995) 10 Cal.4th 463, 514 [41 Cal.Rptr.2d 826, 896 P.2d 119].)

Jeanne also cites *Gautt v. Lewis* (9th Cir. 2007) 489 F.3d 993, 1002 (*Gautt*), in support of her contention. *Gautt* involved a defendant who was ultimately convicted of a firearm enhancement different from the one alleged in the charging document. The charging document alleged an enhancement under section 12022.53, subdivision (b), and alleged section 12022.53(b)'s defining element—i.e., that Gautt " 'personally used a firearm.' " (*Gautt, supra,* at p. 1006.) However, the jury was provided with a verdict form that set forth most of the elements unique to section 12022.53, subdivision (d)— i.e., that the defendant personally discharged a firearm and proximately caused the victim's death.[15] (*Gautt, supra,* at pp. 1000–1001.) The trial court sentenced Gautt to the 25-year-to-life enhancement corresponding with section 12022.53, subdivision (d), despite the fact that Gautt had been charged with only a violation of section 12022.53, subdivision (b), which carried a 10-year enhancement. (*Gautt, supra,* at p. 1008.) The Ninth Circuit Court of Appeals determined that Gautt had not received sufficient notice of the actual underlying enhancement charge, which carried a much heavier penalty than the crime that was alleged. (*Ibid.*) However, in reaching this conclusion, the *Gautt* court distinguished what occurred there—i.e., a claim of insufficient notice of a *charge*—from cases involving a defendant who maintains that he received insufficient notice of a particular *theory* of the case. (*Id.* at p. 1009.) This case, like the cases distinguished by the *Gautt* court, does not involve a claim of insufficient notice of a *charge*; rather, Jeanne contends that she did not receive adequate notice of a *theory* of first degree murder. *Gautt* therefore does not assist Jeanne.

---

[15] The verdict form did not, however, include section 12022.53, subdivision (d)'s element that the discharging be intentional.

Jeanne also relies on *Sheppard v. Rees* (9th Cir. 1990) 909 F.2d 1234 (*Sheppard*). In that case, after both the prosecution and defense had rested, both submitted their requested jury instructions to the court. (*Id.* at p. 1235.) Up to that point, the prosecutor had made no mention of wanting to include an instruction on felony murder. It was not until the day after the jury instruction issues had been resolved that the prosecutor first requested instructions on robbery and felony murder. (*Ibid.*) The court instructed the jury on felony murder. In an opinion published after rehearing, the Ninth Circuit Court of Appeals explained that in an earlier opinion in the case, it had agreed with the defendant that his Sixth Amendment right to be informed of the nature and cause of the accusation against him had been violated by the court instructing on felony murder under these circumstances. (*Sheppard, supra*, at pp. 1235–1236.) In the petition for rehearing, the People then *conceded* that under the facts of that case, Sheppard had been denied adequate notice and opportunity to prepare to defend against a charge of felony murder because " 'a pattern of government conduct affirmatively misled the defendant, denying him an effective opportunity to prepare a defense.' " (*Id.* at p. 1236, italics omitted.) In other words, " ' "The defendant was ambushed." ' " (*Ibid.*, citations omitted.)

 Jeanne acknowledges that *Sheppard* is of limited precedential value, given that it is at odds with binding California Supreme Court precedent regarding the notice requirements for pleading murder. (See *People v. Lucas* (1997) 55 Cal.App.4th 721, 738 [64 Cal.Rptr.2d 282].) "California and Ninth Circuit decisions have uniformly viewed *Sheppard* narrowly and limited it to its facts. Thus, for example, no ' "ambush" ' occurs where felony-murder instructions are mentioned for the first time at an initial instructions conference, so long as trial evidence supports the theory and the defense has a day or more to prepare oral argument. [Citations.]" (*Ibid.*)

In this case, the defense was not "ambushed." John provided the testimony that supported a theory of felony murder based on kidnapping, and the prosecutor indicated his desire to have the jury instructed on that theory of first degree murder immediately after John gave that testimony. Unlike in *Sheppard*, where the attorneys discussed the instructions and there was no mention of felony murder, in this case there was extensive discussion of the felony murder theory before testimony in the case had concluded. In addition, the trial court offered defense counsel for both defendants additional time to prepare to deal with the felony murder charge, and both counsel declined. Under these circumstances, we conclude that Jeanne was not denied adequate notice and opportunity to prepare to defend against a charge of felony murder.

H. *Cumulative error*

Jeanne contends that the cumulative effect of the errors that she alleges requires reversal. "Under the 'cumulative error' doctrine, errors that are individually harmless may nevertheless have a cumulative effect that is prejudicial." (*In re Avena* (1996) 12 Cal.4th 694, 772, fn. 32 [49 Cal.Rptr.2d 413, 909 P.2d 1017].) Because we have concluded that Jeanne's conviction must be reversed as a result of the trial court's instruction on aiding and abetting, in combination with the court's response to the jury's questions about the intent of a potential aider and abettor, and because we have rejected Jeanne's other claims of error, we need not consider Jeanne's cumulative error argument.

IV.

DISPOSITION

The judgment is affirmed as to John. Jeanne's conviction on count 1 is reversed and the case is remanded for further proceedings.

Nares, Acting P. J., and McDonald, J., concurred.

Appellants' petition for review by the Supreme Court was denied September 26, 2012, S204197.