Filed 4/11/13  P. v. Vasquez CA2/3

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>FRANCISCO VASQUEZ et al.,<br><br>    Defendants and Appellants. | B238989<br><br>(Los Angeles County<br>Super. Ct. No. BA361251) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Robert J. Perry, Judge.  Modified and, as so modified, affirmed.

Sally Patrone Brajevich, under appointment by the Court of Appeal, for Defendant and Appellant Francisco Vasquez.

Lynda A. Romero, under appointment by the Court of Appeal, for Defendant and Appellant Ali Fateh.

Linn Davis, under appointment by the Court of Appeal, for Defendant and Appellant Anthony Gonzales.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Mary Sanchez and Jonathan M. Krauss, Deputy Attorneys General, for Plaintiff and Respondent.

Defendants and appellants Anthony Gonzales and Francisco Vasquez appeal their convictions for two counts of attempted premeditated murder. Defendant and appellant Ali Fateh appeals his convictions for second degree murder, two counts of attempted premeditated murder, and evading an officer, causing death. Gonzales and Vasquez were sentenced to 58 years to life in prison; Fateh was sentenced to 65 years to life. Appellants contend the evidence was insufficient to support their attempted murder convictions, and the trial court committed instructional error. Appellant Fateh further asserts that his abstract of judgment contains a clerical error which must be corrected. We correct the abstract as Fateh requests. In all other respects, we affirm.

FACTUAL AND PROCEDURAL BACKGROUND

1. *Facts.*

a. *People's evidence.*

Appellants Vasquez, Gonzales, and Fateh, and victim Gomez, were all members of the Canoga Park Alabama criminal street gang (CPA), a predominantly Hispanic gang. The CPA claimed as its territory an area of Canoga Park roughly bordered by Topanga Canyon, Nordhoff, Van Owen, and Corbin streets. The gang's primary activities included narcotics sales, assaults, hate crimes, robberies, burglaries, and murder. The CPA gang hated African-Americans, as evidenced by the gang's graffiti and their acts of violence perpetrated against African-Americans.

(i) *The shooting.*

At approximately 11:30 p.m. on May 23, 2010, Terrence Blackman and his brother, Gregory Wilborn, who were both African-American, were standing in front of Wilborn's apartment complex located on Canby Avenue in Reseda, smoking cigarettes and chatting about sports. They were not gang members, were not armed, and were not selling marijuana. The apartment was located outside the CPA gang's territory, and was controlled by one or more gangs which were CPA rivals.

2

Two Hispanic men, later identified as appellants Gonzales and Vasquez,[1] walked down Canby toward Blackman and Wilborn, side by side. When Gonzales and Vasquez were five to seven feet from Blackman and Wilborn, Vasquez said "fuck you, nigger" or similar words and pointed a gun at the brothers. Blackman and Wilborn heard a clicking sound. Blackman realized Vasquez was attempting to fire the gun, but it had jammed. Blackman told Wilborn to run. Gonzales, who also had a gun, ran into the street as if to get a better angle and fired two shots at the brothers as they fled up a driveway towards the apartments. One shot hit Wilborn in the thigh.

Armaondo Ramirez, whose apartment was located on Canby Avenue, heard the gunshots and looked out his window. He saw a black or dark-colored car, with its headlights off, double parked and blocking a driveway across the street on Canby. A Hispanic man jumped into the front passenger seat. The car then drove off at high speed. A surveillance tape obtained from a camera mounted on a nearby building showed the car pulling up and stopping at the curb at 11:31 p.m., and departing at 11:33 p.m.

(ii) *The high-speed chase and collision.*

Alerted to the shooting via a 911 call, Los Angeles Police Department (L.A.P.D.) officers responded to the scene and searched for the assailants. Officer James Leone, who was in an unmarked car, spotted appellants' black Toyota driving northbound away from the area of the shooting. Fateh was driving, Vasquez was seated in the front passenger seat, Gomez was in the rear passenger side seat, and Gonzales was in the rear driver's side seat. Leone followed the car, which sped up to between 55 and 60 miles per hour. Leone called for backup. Officer Edward Maranian and his partner pulled up behind the Toyota at a red light. When the light turned green, Fateh accelerated to 50 miles per hour and drove westbound on Roscoe, with the officers following, their police cruiser's lights and siren on. Fateh led the officers on a high-speed chase, during which he drove at speeds of at least 50 miles per hour, drove through a "dip" in the road

---

[1] We consider appellant Vasquez's contention that the evidence was insufficient to prove his identity as one of the assailants *post.*

fast enough to send up sparks, ran at least five stop signs and one red light without slowing, cut through an alley and then a Food 4 Less parking lot, narrowly missing a pedestrian, and made a U-turn on a red light in the middle of an intersection. When the Toyota reentered Saticoy after exiting the grocery parking lot, Fateh accelerated to speeds of 80 miles per hour. The car was "straddling, swaying from side to side, zigzagging, . . . displaying clearly evasive maneuvers trying to get away" from the pursuing officers. An L.A.P.D. helicopter began following the Toyota from the air, and Officer Maranian terminated his pursuit because it had become too dangerous. The Toyota continued at speeds of up to 80 miles per hour down Saticoy.

At the intersection of Saticoy and Mason streets, the Toyota—which still had its headlights off—ran another red light. Two other vehicles were approaching the intersection, one from the north and one from the south. The Toyota drove between the two vehicles, narrowly missing them as all three vehicles crossed the intersection. The Toyota's right rear taillight lightly tapped the right front bumper of one of the other vehicles, a truck being driven by Melissa Messer. The Toyota careened down Saticoy, "completely out of control," and slammed into several parked cars. The impact crushed the back half of the Toyota.

Fateh exited the Toyota, talking on a cellular telephone. Vasquez attempted to start the car and reached under the front seat before he was pulled from the mangled wreckage by officers. Gonzales, who was in the back seat unconscious and badly injured, was transported to a hospital. Gomez, who had suffered major trauma, was dead.

(iii) *The investigation.*

An officer found two .32-caliber shell casings on Canby Avenue, near where the shooting occurred. A .32-caliber semiautomatic Beretta handgun was found in the Toyota, in a pool of blood underneath Gomez's body, which was slumped over onto the left rear passenger seat. Forensic testing determined that the bullet casings found at the scene were fired from the gun found in the Toyota. Gunshot residue tests were performed on Vasquez, Gonzales, and Gomez's body; no gunshot residue was detected. A second gun was never found.

4

Wilborn and Blackman consistently stated that the assailant who fired the shots wore a gray "hoodie" sweatshirt. When pulled from the wrecked Toyota, Gonzales was wearing a gray hooded sweatshirt. At trial, both Blackman and Wilborn testified that the first assailant, who made the racial slur and whose gun jammed, wore a dark or blue sports jersey with a white T-shirt underneath. When apprehended at the crash site, Vasquez was wearing a blue New Jersey Nets jersey with a white T-shirt underneath. In September 2010, Blackman and Wilborn were separately shown a photographic "clothing lineup" of the attire worn by the four men in the Toyota. Both identified Gonzales's gray hooded sweatshirt, and Vasquez's blue jersey and white T-shirt, as the clothing, or very similar to the clothing, worn by the assailants. Neither recognized the clothing worn by Fateh or Gomez. Although the record is not entirely clear, it appears that Blackman may have also identified a photograph of Gonzales as the shooter in a pretrial photographic lineup. Prior to trial Blackman gave police a variety of descriptions of the clothing worn by the first assailant. His description of the first assailant's height and weight was inconsistent with Vasquez's actual height and weight.

(iv) *Gang evidence.*

In addition to the evidence regarding criminal street gangs discussed *ante,* an expert testified in response to a hypothetical based on the facts of the case that in his opinion, the shooting was committed for the benefit of, at the direction of, or in association with, a criminal street gang. The People presented additional evidence relevant to proof of the street gang enhancements.[2]

b. *Defense evidence.*

Gonzales testified in his own behalf. His mother was African-American, and his father was Hispanic. He denied being a CPA member, and did not use the moniker "Ickie." On the night of the shooting, Gomez called Gonzales and asked if he wanted to purchase marijuana with him. Gonzales agreed and the two met at a car wash on

---

[2]     Because appellants do not challenge the sufficiency of the evidence to prove the gang enhancements, we do not further detail that evidence here.

5

Sherman Way, where Gomez explained that Fateh would pick them up. En route to the transaction site, Gomez spotted his friend, Vasquez, who appeared to be intoxicated and ill. Fateh agreed to give Vasquez a ride home and the trio picked Vasquez up. Gonzales had not previously met Fateh or Vasquez. When the group arrived on Canby, Gomez exited the car and asked Gonzales to accompany him. Gonzales complied. Gomez told Gonzales to wait 50 to 60 feet from the meeting point, because drug dealers "don't like doing business with people that they don't know." Gomez talked to two men. Gonzales had his back toward them but overheard "words being exchanged." Someone said, "go home you fuckin' wetback" and someone else said "[f]uck you, niggers." Gonzales heard two to three shots and saw Gomez running. Frightened, Gonzales ran to the car as well. He was "shocked" and "just wanted to get out of there." When they heard sirens, Fateh stated that he was going to pull over, but Gomez said, "No, no. Go, go. Just go." Vasquez was asleep during the shooting and the chase. Gonzales denied he had ever possessed, owned, or fired a gun, and had not known Gomez had a gun.[3]

c. *People's rebuttal.*

In rebuttal, the People presented evidence that Gonzales had admitted his CPA gang membership to a detective and to an L.A.P.D. officer in November 2007, and had scratched his moniker on a Styrofoam cup during a police interview. A search of a residence where Gonzales was present, conducted in September 2008, turned up paperwork containing Gonzales's moniker, references to the CPA gang, and a notation indicating a rivalry with the Original Valley Gangsters, an African-American gang.

2. *Procedure.*

Trial was by jury. Fateh was convicted of the second degree murder of Gomez (Pen. Code, § 187, subd. (a))[4] and evading an officer, causing Gomez's death (Veh.

---

[3]    Fateh presented the testimony of his mother and an ex-girlfriend. As that testimony is not relevant to the issues presented on appeal, we do not include it here. Vasquez presented no evidence.

[4]    All further undesignated statutory references are to the Penal Code.

Code, § 2800.3, subd. (b)). All three appellants were convicted of the willful, deliberate, and premeditated attempted murders of Blackman and Wilborn (§§ 664, 187, subd. (a)). The jury further found the attempted murders and the evading an officer crimes were committed for the benefit of a criminal street gang (§ 186.22, subd. (b)(1)(C)); in the commission of the attempted murders, a principal personally and intentionally discharged a firearm, proximately causing great bodily injury to Wilborn (§ 12022.53, subds. (c), (d), (e)(1)); and, as to Gonzales and Vasquez, the attempted murders were hate crimes (§ 422.75, subd. (b)). The jury found the hate crime allegations not true as to appellant Fateh. The trial court sentenced Fateh to a term of 65 years to life in prison. It sentenced Vasquez and Gonzales to terms of 58 years to life in prison. As to all appellants, the court imposed restitution fines, suspended parole restitution fines, court security fees, and criminal conviction assessments, and ordered appellants to pay victim restitution. Fateh, Gonzales, and Vasquez appeal.

DISCUSSION

1. *Sufficiency of the evidence.*

Appellants challenge the sufficiency of the evidence to prove their convictions for attempted murder on several different grounds. None have merit.

a. *Applicable legal principles.*

When determining whether the evidence was sufficient to sustain a criminal conviction, "we review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence that is reasonable, credible and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citations.]" (*People v. Snow* (2003) 30 Cal.4th 43, 66; *People v. Houston* (2012) 54 Cal.4th 1186, 1215; *People v. Elliott* (2012) 53 Cal.4th 535, 585.) We presume in support of the judgment the existence of every fact the trier of fact could reasonably deduce from the evidence. (*People v. Medina* (2009) 46 Cal.4th 913, 919.) Reversal is not warranted unless it appears " 'that upon no hypothesis whatever is there sufficient substantial evidence to support [the conviction].' [Citation.]" (*People v. Bolin* (1998) 18 Cal.4th 297, 331; *People v. Zamudio* (2008) 43

7

Cal.4th 327, 357.)  The same standard of review applies to cases in which the prosecution relies primarily on circumstantial evidence.  (*Houston*, at p. 1215.)

b.  *The evidence was sufficient to prove intent to kill.*

Appellants argue that there was insufficient evidence they had the intent to kill, and therefore their convictions for the attempted murders of Blackman and Wilborn must be reversed.  We disagree.

 " 'Attempted murder requires the specific intent to kill and the commission of a direct but ineffectual act toward accomplishing the intended killing.  [Citation.]  Attempted murder requires express malice, that is, the assailant either desires the victim's death, or knows to a substantial certainty that the victim's death will occur.'  [Citation.]" (*People v. Houston, supra,* 54 Cal.4th at p. 1217; *People v. Smith* (2005) 37 Cal.4th 733, 739.)  Intent to kill may be inferred from the defendant's acts and the circumstances of the crime.  (*Smith*, at p. 741.)  "The act of shooting a firearm toward a victim at close range in a manner that could have inflicted a mortal wound had the shot been on target is sufficient to support an inference of an intent to kill."  (*Houston*, at p. 1218; *Smith*, at p. 741.)  The circumstance that the bullet misses its mark or fails to prove lethal is not dispositive.  (*Smith*, at pp. 741-742.)

Viewing the evidence in the light most favorable to the verdict (*People v. Gonzalez* (2012) 54 Cal.4th 643, 653), the evidence was sufficient.  When Gonzales and Vasquez were between five to seven feet away from Blackman and Wilborn, Vasquez attempted to fire shots at them, but his gun jammed.  Gonzales, who had been side-by-side with Vasquez, ran into the street, apparently to obtain a better angle, and fired two shots as Blackman and Wilborn ran down a driveway toward Wilborn's apartment building.  One of those shots hit Wilborn in the thigh.  Blackman heard bullets "wheezing [*sic*] past [his] body."  From this evidence alone, the jury could readily have inferred that appellants intended to kill the victims.  (*People v. Smith, supra,* 37 Cal. 4th at pp. 741-742; *People v. Houston, supra,* 54 Cal.4th at p. 1217.)

Gonzales argues that the evidence was insufficient to prove the shots were fired at close range.  He points out that the victims were halfway down the apartment driveway

8

when the shots were fired, and there was no evidence regarding the length of the driveway. He contrasts this showing with that in *People v. Smith, supra,* 37 Cal.4th at pages 742 to 743, in which the defendant fired a shot at a mother and her baby from approximately a car length away.

These arguments are not persuasive. The jury could have concluded the shooting was conducted at close range. When Vasquez first attempted to shoot, he was within seven feet of the victims, a distance which indisputably qualifies as "close range." The jury could readily have inferred Vasquez intended to shoot to kill. When Vasquez's gun jammed, Gonzales immediately got into a position in the street and fired two shots directly at the victims. From this the jury could have deduced that the attack on the men was coordinated, and Gonzales shared Vasquez's homicidal intent.

Moreover, while the precise distance was not measured at trial, the victims were certainly not far from Gonzales when the shots were fired. Contrary to Gonzales's argument that no evidence was presented regarding the driveway's length, in fact a photograph showing the driveway was admitted into evidence. Jurors could no doubt have determined the relevant distances from that exhibit. More importantly, we do not read *Smith* as demarcating some arbitrary point beyond which a shooting cannot be considered to have been at close range. *Smith* holds that the act of firing a weapon in a manner that could have inflicted a mortal wound, had the bullet been on target, suffices to establish intent to kill. (*People v. Smith, supra,* 37 Cal.4th at pp. 741-742.) Wilborn was actually hit in the thigh; certainly if the bullet had been on target, it would have inflicted a mortal wound. That appellants abandoned their efforts after firing two shots, and that the victims escaped death due to Gonzales's "poor marksmanship," did not compel the jury to conclude they lacked the intent to kill.[5] (*People v. Houston, supra,* 54 Cal.4th at p. 1218; *Smith*, at p. 741.)

---

[5]    Gonzales argues that purported contradictions in the evidence regarding whether there were one or two shooters, and whether there were one or two guns, "seriously undermined" the value of the evidence. Gonzales's arguments amount to a request that we reweigh the evidence, which is not our function. (*People v. Smith, supra,* 37 Cal.4th

*People v. Ramos* (2011) 193 Cal.App.4th 43, is instructive. There, the victim was outside his residence, escorting guests, when the defendant fired shots from across the street. The victim heard the shots " 'whistling' past him" and fled down the street. Ramos contended there was insufficient evidence of his intent to kill "because the evidence established that he fired gunshots from a distance during [the] nighttime." (*Id.* at p. 47.) *Ramos* rejected this contention, explaining, "Although [the defendant] may have been a distance away, the gunshots 'whistled' past [the victim] and could have inflicted a mortal wound had [the defendant's] marksmanship been better. The trier of fact reasonably drew the inference of intent to kill from the evidence." (*Id.* at p. 48.) The same is true here.

c. *The evidence was sufficient to prove the attempted murders were premeditated and deliberate.*

Appellants next argue the evidence was insufficient to establish the attempted murders were premeditated and deliberate.[6] Premeditation and deliberation requires more than a showing of intent to kill. (*People v. Concha* (2010) 182 Cal.App.4th 1072, 1083-1084.) An intentional killing is premeditated and deliberate if it occurred as the result of preexisting thought and reflection, rather than as the product of an unconsidered or rash impulse. (*People v. Burney* (2009) 47 Cal.4th 203, 235; *People v. Jurado* (2006)

at p. 739.) Gonzales similarly argues that the gang expert's testimony was insufficient to establish appellants' gang-related motive for the shooting, because the testimony was contradictory and unbelievable. As we discuss *post,* this argument is likewise untenable on appeal. In any event, evidence of motive is not an element of attempted murder, although it may be probative of intent to kill. (*Smith*, at pp. 740-741.) The evidence of the manner of the shooting was sufficient to prove intent even absent any evidence of motive.

[6]    The crime of attempted murder is not divided into degrees, but a defendant's sentence may be enhanced if the attempt to kill was committed with premeditation and deliberation. (*People v. Gonzalez, supra,* 54 Cal.4th at p. 654; *People v. Smith, supra*, 37 Cal.4th at p. 740.) Attempted murder is generally punishable by imprisonment for between five and nine years, but this term is increased to life imprisonment with the possibility of parole if the attempt was premeditated and deliberate. (§ 664, subd. (a); *Gonzalez*, at p. 654.)

10

38 Cal.4th 72, 118.)  A reviewing court normally considers three types of evidence when determining whether a finding of premeditation and deliberation is adequately supported: planning activity by the defendants; motive; and the manner of killing.  (*People v. Gonzalez, supra,* 54 Cal.4th at pp. 663-664; *Burney*, at p. 235; *People v. Romero* (2008) 44 Cal.4th 386, 401; *People v. Anderson* (1968) 70 Cal.2d 15, 26-27.)  These so-called "*Anderson*" factors are not the exclusive means to establish premeditation and deliberation, and need not be present in any particular combination, or at all, to establish the evidence was sufficient.  (*Gonzalez*, at p. 663; *Burney,* at p. 235; *People v. Tafoya* (2007) 42 Cal.4th 147, 172; *People v. Lenart* (2004) 32 Cal.4th 1107, 1127.)

The evidence here satisfied all three *Anderson* factors.  First, the jury could have inferred there was evidence of planning.  Gomez, Gonzales, Vasquez, and Fateh travelled, as a group, to rival gang territory.  They brought at least one loaded weapon to the site, demonstrating their preconceived plan to use deadly force.  (See *People v. Gonzalez, supra,* 54 Cal.4th at p. 664 [fact defendant brought a loaded rifle to ambush site supported an inference of planning]; *People v. Lee* (2011) 51 Cal.4th 620, 636 [fact defendant brought a loaded handgun indicated he had considered the possibility of a violent encounter].)  Vasquez and Gonzales then calmly shot at the victims for no apparent reason, and fled in the waiting car.  (See *Lee*, at p. 637 [calm and exacting manner of killing supported conclusion it was the result of preexisting thought, not an unconsidered rash impulse].)  These coordinated actions, involving the use of weapons brought to the scene and an unprovoked attack on strangers, strongly suggested appellants were carrying out a prearranged plan.

Second, the evidence supported a finding that appellants had a motive to kill.  There was evidence all three appellants, as well as Gomez, were CPA gang members.  Their gang harbored animosity toward African-Americans, and one of the gang's primary activities was committing hate crimes.  Both victims were African-American and appear to have been chosen at random as targets because of their race.  Just before attempting to shoot, Vasquez hurled a racial epithet at the victims.  Based on the gang expert's

11

testimony, commission of the instant crimes would have bolstered the CPA gang's image, as well as built "respect," as that term is understood in the gang culture, for appellants.

Finally, the manner of killing suggested a preplanned attack. Vasquez and Gonzales attempted to shoot the victims from relatively close range, without provocation. When Vasquez's gun jammed, Gonzales continued the attack by firing shots as the men ran away. This method of attempted killing is analogous to an execution-style murder, and suggested a preconceived design to kill. (See generally *People v. Gonzales and Soliz* (2011) 52 Cal.4th 254, 295 [close-range shooting without any provocation or evidence of a struggle supported an inference of premeditation and deliberation]; *People v. Tafoya, supra,* 42 Cal.4th at p. 172; *People v. Lenart, supra*, 32 Cal.4th at p. 1127.)

Gonzales argues that the gang expert's testimony did not "reasonably inspire[ ] confidence," in that it was purportedly "rife" with "inconsistencies, surmise and conjecture." He urges that the evidence the CPA gang committed hate crimes was outdated; the gang expert had been assigned to the gang for only 11 months; in contrast to all other known hate crimes committed by the CPA, the shooting was committed outside CPA territory; and Gonzales, who was half African-American and half Hispanic, would not have been allowed to join the CPA gang. Further, he argues that Wilborn was shot in the thigh, not a vital area, but appellants did not pursue him and fire additional shots; and appellants might have brought the gun as protection if they were involved in a drug deal. Gonzales urges that the defense theory—that the shooting was the result of a drug deal gone bad—was more plausible than the People's evidence. He points out that Blackman had suffered a 2003 conviction for selling marijuana, and expresses skepticism that the victims were simply talking in front of the apartment, as opposed to selling drugs.

As is readily apparent, Gonzales's arguments are nothing more than a request that this court reweigh the evidence. " '[I]t is not a proper appellate function to reassess the credibility of the witnesses.' [Citation.]" (*People v. Friend* (2009) 47 Cal.4th 1, 41; *People v. Cortes* (1999) 71 Cal.App.4th 62, 81 [where an appellant "merely reargues the evidence in a way more appropriate for trial than for appeal," we are bound by the trier of fact's determination].) We resolve neither credibility issues nor evidentiary conflicts.

12

(*People v. Maury* (2003) 30 Cal.4th 342, 403; *People v. Mejia* (2007) 155 Cal.App.4th 86, 98.)  The fact the evidence might have been reconciled with a contrary finding does not warrant a reversal.  (*People v. Livingston* (2012) 53 Cal.4th 1145, 1170; *People v. Martinez* (2008) 158 Cal.App.4th 1324, 1331.)

     d.  *The evidence was sufficient to establish that Vasquez was one of the two gunmen.*

     Next, Vasquez urges that the evidence was insufficient to establish that he—rather than the decedent, Gomez—was one of the two gunmen.  He is incorrect.

     Viewed in the light most favorable to the judgment, the evidence showed the following.  When the Toyota crashed, Fateh, Gonzales, Vasquez, and Gomez were inside.  A gun found in the car was determined to be the gun used in the shooting.  Thus, there was ample evidence to prove two of the four men in the car were the assailants.  At the crash scene, Gonzales was wearing a gray hooded sweatshirt; Vasquez was wearing a blue New Jersey Nets jersey, with a white T-shirt underneath; Fateh was wearing brown shorts, a blue shirt, and a white undershirt; and Gomez was wearing a dark blue shirt and a cap.  When shown a photographic lineup of the clothing worn by all four men, both Blackman and Wilborn identified Gonzales's gray hooded sweatshirt as the attire worn by the shooter, and Vasquez's blue New Jersey Nets jersey and white T-shirt as the clothing worn by the assailant who uttered the racial slur and attempted to shoot with the jammed gun.  Neither Wilborn nor Blackman recognized the clothing worn by Fateh or Gomez.  At trial, both Blackman and Wilborn testified that the first assailant wore a black or blue jersey with a white T-shirt underneath, and the shooter wore a gray hooded sweatshirt.  Blackman was sure the first assailant's shirt was a jersey, because he had a collection of jerseys and knew "what a sports jersey look[s] like."  From this evidence, the jury could reasonably have concluded Vasquez was the first assailant who uttered the racial slur, and Gonzales was the assailant who fired shots.

     To be sure, the evidence regarding the description of the first assailant was not entirely consistent.  On the date of the shooting, Blackman told an L.A.P.D. officer that the shooter had worn a white T-shirt with a baseball cap or bandanna, while the other

assailant wore a gray hooded sweatshirt. On June 2, 2010, Blackman told FBI Special Agent Efren Delgado there had been one shooter, who had worn a baggy white T-shirt, black pants, and a bandanna or beanie. On August 10, 2010, Blackman told Agent Delgado he was unsure whether there had been one or two guns. He described the gunman's attire as a white sports jersey with black or white lettering, worn beneath a black open sweatshirt. At trial, Blackman testified that the assailant who made the racial slur was approximately 5 feet 4 inches to 5 feet 6 inches tall, and was short and stocky. Vasquez was six feet tall and weighed 225 pounds. Gomez was 5 feet 6 inches tall, and was somewhat overweight at 178 pounds. Ramirez told police the man he saw enter the car on Canby was "skinny," approximately 5 feet 7 inches tall, wearing a dark or black "hoodie" sweatshirt.

Vasquez additionally points out that the area where the shooting occurred was not well lit; the incident happened fast; Wilborn had poor vision, and was not wearing his glasses; Wilborn and Blackman never identified his face; the clothing identified at the scene "could have been switched"; gunshot residue was not detected on Vasquez, Gonzales, or Gomez; Vasquez's fingerprints were not found on the gun; Gonzales testified that he and Gomez, not Vasquez, were the ones who exited the car; Vasquez's blood alcohol level was "above high normal," supporting Gonzales's testimony that Vasquez was asleep during the incident; Ramirez's description of the man who entered the car matched Gomez, not Vasquez; the gun was found under Gomez's body; and both Wilborn and Blackman were convicted felons, undercutting their credibility. He urges that "in light of the significant contradictions in the evidence presented at trial," his convictions for attempted murder must be reversed.

Many of the points made by Vasquez do not involve genuine evidentiary conflicts, or do not support his conclusion that Gomez was one of the assailants. For example, the gun was apparently not tested for fingerprints; it is unlikely fingerprints could have been obtained from it, given that it was found in a pool of blood. The jury could have concluded the purported discrepancies regarding whether there were one or two shooters were explainable as a matter of semantics, given that there were two men with guns but

14

only one successfully fired shots. Because Vasquez's gun jammed, one would not necessarily expect to find gunshot residue on his hands. The functional gun was found where Gonzales—the shooter—had been seated, not in the seat that had been occupied by Gomez.[7] The street, while not brightly lit, was nonetheless illuminated by a streetlight. There was no evidence the men in the Toyota changed clothes during the car chase, and no reason to suspect that they would have done so. Ramirez's description of the man at the scene did not clearly match Gomez; Gomez was not "skinny," as Ramirez described, but was overweight. Moreover, Gomez was wearing a blue shirt when extricated from the crashed car, not a black hooded sweatshirt.

Given the evidence as a whole, the discrepancies in the descriptions of the first assailant did not make the clothing lineup identifications impossible to believe or inherently improbable. " 'Apropos the question of identity, to entitle a reviewing court to set aside a jury's finding of guilt the evidence of identity must be so weak as to constitute practically no evidence at all.' [Citations.]" (*People v. Mohamed* (2011) 201 Cal.App.4th 515, 521.) That was not the case here. Blackman may have been confused at times about exactly what the first assailant was wearing, but he repeatedly stated the first assailant wore a white T-shirt and/or a jersey, both of which matched Vasquez's clothing. Discrepancies or omissions in descriptions of a defendant do not necessitate the jury's rejection of an identification. (*Mohamed*, at p. 522.) That neither victim identified Vasquez's face does "not preclude the existence of sufficient support for the jury's verdict. '[I]t is not necessary that any of the witnesses called to identify the accused should have seen his face. . . . Identification based on other peculiarities may be reasonably sure. Consequently, the identity of a defendant may be established" by a variety of facts, including clothing. (*Ibid.*)

---

**7** The gun was found beneath Gomez's body because the force of the crash pushed him against the left rear passenger door and caused him to slump into the left rear passenger seat.

In sum, " '[t]he strength or weakness of the identification [and] the incompatibility of and discrepancies in the testimony" go to the weight of the evidence and the credibility of the witnesses, and are questions for the jury. (*People v. Mohamed, supra*, 201 Cal.App.4th at p. 522.) "Conflicts and even testimony which is subject to justifiable suspicion do not justify the reversal of a judgment," for it is the exclusive province of the jury to determine the truth or falsity of the facts upon which a determination depends. (*People v. Maury*, *supra,* 30 Cal.4th at p. 403; *People v. Elliott, supra,* 53 Cal.4th at p. 585.)

*Tomlin v. Myers* (9th Cir. 1994) 30 F.3d 1235, cited by Vasquez, does not assist him. The issue in *Tomlin* was not the sufficiency of the evidence to support an identification; instead it was whether counsel was ineffective for failing to challenge an in-court identification that was tainted by an illegal lineup. In the context of discussing whether counsel's deficient performance was prejudicial, a divided court considered various weaknesses in the witness's identification significant. (*Id.* at pp. 1241-1243.) *Tomlin* does not support a finding the evidence was insufficient here.

e. *The evidence was sufficient to establish Fateh aided and abetted the attempted murders.*

Fateh urges the evidence was insufficient to establish he acted as an aider and abettor in the attempted murders. A person who aids and abets the commission of a crime is a principal in the crime. (*People v. McCoy* (2001) 25 Cal.4th 1111, 1116-1117; *People v. Mejia* (2012) 211 Cal.App.4th 586, 605-606; § 31.) "[T]o be guilty of attempted murder as an aider and abettor, a person must give aid or encouragement with knowledge of the direct perpetrator's intent to kill and with the purpose of facilitating the direct perpetrator's accomplishment of the intended killing—which means that the person guilty of attempted murder as an aider and abettor must intend to kill."[8] (*People v. Lee*

---

[8]    Although the People were required to prove Fateh intended that the victims be killed, they were not required to prove that he personally premeditated and deliberated. (*People v. Lee, supra,* 31 Cal.4th at p. 627 ["section 664(a) properly must be interpreted to require only that the murder attempted was willful, deliberate, and premeditated, but

16

(2003) 31 Cal.4th 613, 624; *People v. Gonzalez, supra,* 54 Cal.4th at p. 654, fn. 8; *Mejia*, at p. 606.)

Among the factors that may be taken into account when determining whether a defendant was an aider and abettor are presence at the crime scene, companionship, and conduct before and after the offense, including flight. (*In re Juan G.* (2003) 112 Cal.App.4th 1, 5; *People v. Medina, supra,* 46 Cal.4th at p. 924; *People v. Battle* (2011) 198 Cal.App.4th 50, 84-85.) Mere presence at the scene of a crime, knowledge of the perpetrator's criminal purpose, or the failure to prevent the crime do not amount to aiding and abetting, although these factors may be taken into account in determining criminal responsibility. (*People v. Garcia* (2008) 168 Cal.App.4th 261, 272-273; *People v. Nguyen* (1993) 21 Cal.App.4th 518, 529-530.) " 'Whether defendant aided and abetted the crime is a question of fact, and on appeal all conflicts in the evidence and reasonable inferences must be resolved in favor of the judgment.' [Citation.]" (*People v. Campbell* (1994) 25 Cal.App.4th 402, 409; *In re Juan G.*, at p. 5.)

Fateh was the getaway car driver; he did not exit the Toyota during the shooting. There is no dispute his act of driving the getaway car to and from the shooting scene constituted sufficient evidence of an act that aided and promoted the crime. There was also sufficient circumstantial evidence from which the jury reasonably could have found Fateh knew the assailants were armed and intended to commit murder, and that he shared their intent. (See *People v. Thomas* (2011) 52 Cal.4th 336, 355 [mental state and intent are rarely susceptible of direct proof and must therefore be proven circumstantially].) The gang expert opined that Fateh and the other three occupants of the Toyota were all members of the CPA gang. The expert's opinion was based in part on the facts Gomez

---

not to require that an attempted murderer personally acted with willfulness, deliberation, and premeditation, even if he or she is guilty as an aider and abettor"]; *People v. Favor* (2012) 54 Cal.4th 868, 879 ["an aider and abettor need not share the heightened mental state of the direct perpetrator for the applicability of section 664(a)'s penalty provision" for premeditated murder].)

17

and Vasquez sported CPA gang tattoos; Gomez and Gonzales had admitted their gang membership to officers; an officer had observed Gonzales throwing gang signs; and officers had observed Fateh and Vasquez in the company of other gang members. The gang expert also testified that committing shootings would have enhanced the gang's and the perpetrators' reputations.

Fateh drove the Toyota to an area within the territory of a rival gang. Fateh double-parked the Toyota at a spot where the two victims were loitering on the street, and turned off the vehicle's lights. Vasquez and Gonzales exited, shot at the victims—who were complete strangers to all four men in the Toyota—and immediately reentered the car. The gunshots were loud enough that eyewitness Ramirez, who was inside an apartment across the street, heard them; therefore the jury could infer Fateh heard them as well. Fateh sped off, leading police on a high-speed chase during which he drove with extreme recklessness. The most reasonable interpretation of this evidence was that Fateh knew exactly what was to transpire and was positioned to allow his fellow gang members to commit the shooting and then make a quick getaway. The jury was not obliged to accept the defense theory that the shooting was the result of a drug deal gone sour. The victims testified they were not selling drugs, and the jury was entitled to credit this testimony. Moreover, the jury could reasonably have concluded the facts were inconsistent with such a scenario: the car was only parked for two minutes, not much time for a drug deal to commence, turn contentious, and end in a shooting.

Fateh points out that, as to him, the jury found not true the allegation that the attempted murders were hate crimes. As to codefendants Vasquez and Gonzales, the jury found the hate-crime allegations true. From this circumstance, Fateh reasons that the jury must have concluded he lacked knowledge of his passengers' intent, given that the prosecution theory was that the motive for shooting the victims was racial animosity. But the evidence showed only Gonzales and Vasquez confronted the victims, and only Vasquez uttered a racial slur. While we cannot be sure of the jury's reasoning, it could have concluded Fateh knew of and intended to aid the shooting of persons who might be rival gang members, but declined to find true the hate-crime allegation given that Fateh

18

did not personally utter a racial epithet and was in the car when Vasquez did so. The jury's finding on the hate-crime allegation does not compel a finding the evidence of aiding and abetting was insufficient.

      2. *Instructional error.*

      Fateh argues that the trial court committed instructional error in two respects: first, by failing to adequately instruct on causation; and second, by instructing with a version of CALCRIM No. 400 which incorrectly stated that an aider and abettor is "equally guilty" of crimes committed by a principal.

      a. *The trial court did not err by failing to instruct on causation.*

      (i) *Additional facts.*

      The trial court instructed the jury with CALCRIM No. 520, regarding second degree murder. That instruction stated in pertinent part: "Defendant Fateh is charged in count 1 with second degree murder in violation of Penal Code section 187 on an implied malice theory. [¶] To prove that the defendant is guilty of this crime, the People must prove that: [¶] 1. The defendant *committed an act that caused the death of Joel Gomez*; [¶] AND [¶] 2. When the defendant acted, he had a state of mind called malice aforethought. [¶] There are two kinds of malice aforethought, express malice and implied malice. Proof of either is sufficient to establish the state of mind required for murder. [¶] The defendant acted with express malice if he unlawfully intended to kill. [¶] The defendant acted with implied malice if: [¶] 1. He intentionally committed an act; [¶] 2. The *natural consequences of the act were dangerous to human life*; [¶] 3. At the time he acted, he knew his act was dangerous to human life; [¶] AND [¶] 4. He deliberately acted with conscious disregard for human life." (Italics added.)

      The trial court omitted the following portion of CALCRIM No. 520: "An act causes death if the death is the direct, natural, and probable consequence of the act and the death would not have happened without the act. A *natural and probable consequence* is one that a reasonable person would know is likely to happen if nothing unusual intervenes. In deciding whether a consequence is natural and probable, consider all of the circumstances established by the evidence. [¶] There may be more than one cause of

19

death. An act causes death only if it is a substantial factor in causing the death. A *substantial factor* is more than a trivial or remote factor. However, it does not need to be the only factor that causes the death." (CALCRIM No. 520, brackets omitted.) Defense counsel did not request that the omitted portions of CALCRIM No. 520 be provided to the jury, and did not object to their omission. The trial court did not give, and the defense did not request, CALCRIM No. 240, which is similar to the omitted portion of CALCRIM No 520.[9] Fateh contends omission of these instructions was error.

(ii) *Discussion.*

A trial court must instruct the jury, sua sponte, on the general principles of law that are closely and openly connected to the facts and that are necessary for the jury's understanding of the case. (*People v. Moye* (2009) 47 Cal.4th 537, 548; *People v. Abilez* (2007) 41 Cal.4th 472, 517; *People v. McCloud* (2012) 211 Cal.App.4th 788, 796.) A court is not obliged to instruct on theories that lack substantial evidentiary support. (*People v. Burney, supra,* 47 Cal.4th at p. 246; *People v. Johnson* (2009) 180 Cal.App.4th 702, 707.) Substantial evidence is evidence that a reasonable jury could find persuasive. (*People v. Benavides* (2005) 35 Cal.4th 69, 102; *People v. Ross* (2007) 155 Cal.App.4th 1033, 1049-1050.) Thus, a court has a sua sponte duty to instruct on proximate cause if causation is at issue. (*People v. Bland* (2002) 28 Cal.4th 313, 333-336.)

Proximate cause in a criminal case is defined as " 'a cause which, in natural and continuous sequence, produces the death, and without which the death would not have

---

**9** CALCRIM No. 240 provides: "An act [or omission] causes [injury or death] if the [injury or death] is the direct, natural, and probable consequence of the act [or omission] and the [injury or death] would not have happened without the act [or omission]. A natural and probable consequence is one that a reasonable person would know is likely to happen if nothing unusual intervenes. In deciding whether a consequence is natural and probable, consider all the circumstances established by the evidence. [¶] [There may be more than one cause of [injury or death]. An act [or omission] causes [injury or death], only if it is a substantial factor in causing the [injury or death]. A substantial factor is more than a trivial or remote factor. However, it does not have to be the only factor that causes the [injury or death].]"

occurred.' [Citations.]" (*People v. Armitage* (1987) 194 Cal.App.3d 405, 420.) Proximate cause is " 'clearly established where the act is directly connected with the resulting injury, with no intervening force operating.' [Citation.]" (*Id*. at p. 420; *People v. Schmies* (1996) 44 Cal.App.4th 38, 48-49.) An " ' "independent" intervening cause' " absolves a defendant of liability only when it is " ' "unforeseeable . . . an extraordinary and abnormal occurrence, which rises to the level of an exonerating, superseding cause." [Citation.] On the other hand, a "dependent" intervening cause will not relieve the defendant of criminal liability. "A defendant may be criminally liable for a result directly caused by his act even if there is another contributing cause. If an intervening cause is a normal and reasonably foreseeable result of defendant's original act the intervening act is 'dependent' and not a superseding cause, and will not relieve defendant of liability. [Citation.] '[] The consequence need not have been a strong probability; a possible consequence which might reasonably have been contemplated is enough. [] The precise consequence need not have been foreseen; it is enough that the defendant should have foreseen the possibility of some harm of the kind which might result from his act.' [Citation.]" [Citation.]' " (*People v. Cervantes* (2001) 26 Cal.4th 860, 871; *People v. Mejia, supra,* 211 Cal.App.4th at p. 609; *People v. Schmies, supra,* 44 Cal.App.4th at p. 49.)

Applying these principles here, it is readily apparent no further instruction was required. Preliminarily, we agree with the People that Fateh has forfeited this contention because he failed to request further instruction or object below. In general, a party may not complain on appeal that an instruction correct in law and responsive to the evidence was too general or incomplete unless the party has requested appropriate clarifying or amplifying language. (*People v. Samaniego* (2009) 172 Cal.App.4th 1148, 1163.) Although we may review any instruction given, even in the absence of an objection, "if the substantial rights of the defendant were affected thereby" (§ 1259; *People v. Smithey* (1999) 20 Cal.4th 936, 976-977, fn. 7), as we explain *post,* the purported error did not affect Fateh's substantial rights. Therefore the claim has been forfeited.

CALCRIM No. 520 informed the jury that to prove second degree murder, the People were required to establish Fateh intentionally committed an act that caused Gomez's death. Thus, the issue of causation was squarely before the jury. The causation principles at play when multiple acts might have contributed to the death were not relevant. (See *People v. McCloud, supra,* 211 Cal.App.4th at p. 796 [trial court has duty to refrain from instruction on principles of law that are irrelevant and might confuse the jury].) There was no evidence of an independent intervening cause for the crash and Gomez's death. The evidence was clear that the only cause of Gomez's death was Fateh's exceptionally reckless driving.

Fateh urges that the jury might have considered the fact his car collided with Messer's truck in the intersection just before the crash to be an intervening cause. He argues: "the evidence was undisputed that Melissa Messer hit appellant's vehicle sending it out of control into some parked vehicles. . . . Thus, appellant was entitled to have the jury determine whether Messer's hit was an intervening cause of the accident."

Fateh's argument is not only untenable, but mischaracterizes the record. The implication that Messer was responsible for hitting Fateh's vehicle is misleading: Messer had the green light and was lawfully proceeding through the intersection when Fateh ran the red light, with his vehicle's lights off, at a speed approaching 80 miles per hour. Thus, any impact with Messer's vehicle in the intersection was Fateh's fault and could not have amounted to an independent intervening cause. (See *People v. Cervantes, supra,* 26 Cal.4th at p. 871.) Moreover, an intervening cause absolves a defendant of liability only when it is an unforeseeable, extraordinary, abnormal occurrence. The undisputed evidence showed Fateh led a police vehicle on a high speed chase, with his car's lights off, at night, at speeds up to 80 miles per hour, running numerous stop signs and traffic lights in the process. The possibility he would collide with another vehicle in an intersection and lose control of his Toyota was neither unforeseeable nor unlikely. To the contrary, the only surprising thing about the incident was that Fateh did not hit additional vehicles or pedestrians.

22

Fateh's contention fails as a factual matter as well. Messer testified that Fateh's Toyota barely tapped her right front bumper. The contact was "[s]uper soft . . . we barely touched each other. Just a slight tap is all I felt. No change in my motion at all." According to the helicopter pilot who was chasing Fateh's vehicle, when Fateh entered the intersection, Messer's vehicle was travelling northbound on Mason and another vehicle was travelling southbound. As Fateh entered the intersection, against the red light, he attempted to make a corrective move. To the helicopter pilot, it did not appear that Fateh hit the vehicles in the intersection, but instead "thread[ed] the needle, two vehicles traveling toward each other and he went right between them in a flash and lost control as he continued eastbound through the intersection of Mason . . . ." The only reasonable interpretation of this evidence was that Fateh's own reckless driving, not the "super soft" tap on Messer's bumper, was the cause of the accident and of Gomez's death. As there was no evidence of multiple causes for the crash, the trial court properly omitted additional instruction on causation.

For the same reasons, even if the trial court had committed instructional error—a conclusion we do not adopt—it was harmless under any standard because the additional instructions at issue "could not have aided defendant." (*People v. Bland, supra,* 28 Cal.4th at p. 318.) No reasonable juror could have concluded the contact with Messer's vehicle in the intersection was an independent intervening cause, for the reasons we have set forth. (See *People v. Cervantes, supra,* 26 Cal.4th at pp. 866, 871.)

b. *Instruction with former CALCRIM No. 400.*

Without objection, the trial court instructed with former CALCRIM No. 400, the instruction in effect at the time, as follows: "A person may be guilty of a crime in two ways. One, he may have directly committed the crime. I will call that person the perpetrator. Two, he may have aided and abetted a perpetrator, who directly committed the crime. A person is equally guilty of the crime whether he committed it personally or

23

aided and abetted the perpetrator who committed it."[10]  During argument the prosecutor stated:  "[A] person is equally guilty of the crime whether he committed it personally or aided and abetted the perpetrator who committed it.  In for a penny, in for a pound.  If you're all in, you're all in.  That's how it works basically."

Fateh contends instructing the jury with the "equally guilty" language was error.  We agree, but conclude the error was not prejudicial.

In *People v. McCoy, supra,* 25 Cal.4th 1111, the California Supreme Court held that an aider and abettor may be found guilty of greater homicide-related offenses than those committed by the actual perpetrator.  (*Id.* at p. 1122.)  The court explained that an aider and abettor's guilt is "based on a combination of the direct perpetrator's acts and the aider and abettor's *own* acts and *own* mental state" (*id.* at p. 1117), which could under some circumstances be more culpable than the actual perpetrator's.  (*Id.* at p. 1120.)

In *People v. Samaniego, supra,* 172 Cal.App.4th 1148, the jury was given the same version of CALCRIM No. 400 challenged here.  (*Id.* at pp. 1162-1163.)  The court concluded the instruction was erroneous, because it did not inform the jury that an aider and abettor could be guilty of a lesser crime than the perpetrator.  (*Id.* at pp. 1164-1165.)  *Samaniego* explained:  "Though *McCoy* concluded that an aider and abettor could be guilty of a greater offense than the direct perpetrator, its reasoning leads inexorably to the further conclusion that an aider and abettor's guilt may also be less than the perpetrator's, if the aider and abettor has a less culpable mental state.  [Citation.]  Consequently, CALCRIM No. 400's direction that '[a] person is *equally guilty* of the crime [of which the perpetrator is guilty] whether he or she committed it personally or aided and abetted the perpetrator who committed it' . . . , while generally correct in all but the most exceptional circumstances, is misleading here and should have been modified."

---

**10**    CALCRIM No. 400 has since been amended to remove the word "equally" before the word "guilty."  It now reads:  " 'A person is guilty of a crime whether he or she committed it personally or aided and abetted the perpetrator.' " (*People v. Loza* (2012) 207 Cal.App.4th 332, 348, fn. 8.)

24

(*Samaniego*, at pp. 1164–1165.) *Samaniego* nonetheless concluded use of the instruction was harmless. (*Id.* at pp. 1165-1166.)

In *People v. Nero* (2010) 181 Cal.App.4th 504, we concluded use of an instruction containing similar "equally guilty" language was prejudicial error. In *Nero,* the defendants, a brother and sister, were convicted of second degree murder after the brother stabbed a man to death during an altercation. The People's theory was that the sister aided and abetted the crime by handing her brother the knife during the fight. The brother testified that his sister did not hand him the knife; instead he obtained it from the victim during the fight. (*Id.* at p. 510.) It was undisputed that at the beginning of the altercation, the sister attempted to stop the fight; according to the brother's testimony, she continued urging the men to stop throughout the incident. (*Id.* at pp. 509, 519.) The evidence included a surveillance video which showed that the sister might, or might not, have handed an object that might, or might not, have been a knife, to the brother. (*Id.* at p. 519.)

The trial court instructed the jury with CALJIC No. 3.00, as follows: " 'Persons who are involved in committing or attempting to commit a crime are referred to as principals in that crime. *Each principal, regardless of the extent or manner of participation, is equally guilty.* Principals include those who directly and actively commit or attempt to commit the acts constituting the crime, or, two, those who aid and abet the commission or attempted commission of a crime.' " (*People v. Nero*, *supra*, 181 Cal.App.4th at p. 510.) The prosecutor referenced the instruction during argument, stating that " '[t]hey're equally liable.' " (*Ibid.*) During deliberations, the jury asked if it could find the sister guilty of a lesser homicide-related offense than the brother. (*Id.* at pp. 509, 512.) In response, the court reread CALJIC No. 3.00, including the "equally guilty" language. The jury found both defendants guilty of second degree murder. (*Id.* at pp. 512- 513.)

We concluded use of the instruction was error. (*People v. Nero, supra,* 181 Cal.App.4th at p. 513.) Relying on *McCoy* and *Samaniego,* we reasoned that an aider and abettor could be found guilty of a lesser homicide-related offense than that committed by

the actual perpetrator. (*Nero*, at pp. 507, 513.) We explained that an "aider and abettor's mens rea is personal, [and] . . . may be different than the direct perpetrator's." (*Id.* at p. 514.) Thus, we held that "even in unexceptional circumstances CALJIC No. 3.00 and CALCRIM No. 400 can be misleading." (*Id.* at p. 518.)

On the facts of *Nero,* we concluded the instructional error was prejudicial. (*People v. Nero*, *supra*, 181 Cal.App.4th at p. 518.) There was evidence the sister might have acted on a sudden quarrel or in the heat of passion. (*Id.* at p. 519.) Moreover, the jury's questions clearly indicated it had been considering whether to impose a lesser degree or offense on the sister. We reasoned: "Notwithstanding that other instructions might have given them that option, there is a reasonable possibility that the trial court's response to their questions improperly foreclosed it." (*Id.* at pp. 519-520.) Accordingly, we reversed. (*Id.* at p. 520; see also *People v. Loza, supra,* 207 Cal.App.4th at pp. 351-352.)

The People argue that Fateh has forfeited this contention because he failed to object or request modification of the instruction below. (See *People v. Mejia, supra,* 211 Cal.App.4th at p. 624; *People v. Samaniego, supra,* 172 Cal.App.4th at p. 1163 [finding challenge to CALCRIM No. 400 forfeited in the absence of an objection]; *People v. Loza, supra,* 207 Cal App.4th at p. 350 [because it is generally true that aiders and abettors are equally guilty as direct perpetrators, the defendant's failure to request a modification forfeited the claim]; *People v. Lopez* (2011) 198 Cal.App.4th 1106, 1118-1119.) However, where an "instruction given was wrong, the rule of forfeiture does not apply." (*People v. Hudson* (2006) 38 Cal.4th 1002, 1012.) In light of our conclusion in *Nero* that the "equally guilty" language could be confusing even under unexceptional circumstances, we consider the merits of Fateh's contention. (See § 1259.)

As we concluded in *Nero,* the "equally guilty" language is potentially confusing even in unexceptional circumstances, and should not have been given. (*People v. Nero, supra,* 181 Cal.App.4th at p. 518.) Therefore we must consider whether the instructional error was harmless. " 'An instruction that omits or misdescribes an element of a charged offense violates the right to jury trial' " and is evaluated under " 'the harmless error test

26

of *Chapman v. California* (1967) 386 U.S. 18, 24.' " (*Nero*, at pp. 518-519; *People v. Samaniego, supra,* 172 Cal.App.4th at p. 1165.)

We conclude the error in the instant case was harmless. As in *Samaniego,* the jury was instructed with CALCRIM No. 401, which stated that to establish guilt as an aider and abettor, the prosecution was required to prove "1. The perpetrator committed the crime; [¶] 2. The defendant knew that the perpetrator intended to commit the crime; [¶] 3. Before or during the commission of the crime, the defendant intended to aid and abet the perpetrator in committing the crime; [¶] AND [¶] 4. The defendant's words or conduct did in fact aid and abet the perpetrator's commission of the crime." Applying this instruction, the jury could not have found Fateh guilty unless it concluded he both knew of the planned killing, and intended to assist in its commission. (See *People v. Samaniego, supra,* 172 Cal.App.4th at pp. 1165-1166.)

Unlike in *Nero* and *People v. Loza, supra,* 207 Cal.App.4th 332—which also concluded the "equally guilty" language was prejudicial error—there was no indication in the instant case that the jury was actually confused about the elements of aiding and abetting liability. In *Nero,* the jury expressly asked whether it could find the sister guilty of a lesser offense than the direct perpetrator, indicating it did not understand the aiding and abetting instructions given. The jury was then mislead by the trial court's reread of the "equally guilty" instruction. (*People v. Nero*, *supra*, 181 Cal.App.4th at pp. 519-520.) Similarly in *Loza,* the jury expressly asked whether the aider and abettor's state of mind should be considered, indicating it failed to grasp instructions stating it had to determine the aider and abettor's own intent as to each offense. (*Loza*, at pp. 349, 354-355.) The *Loza* trial court responded to the jury's questions by stating it should apply the evidence to the law as it had been instructed, an inadequate and misleading response under the circumstances. (*Id.* at p. 349.) In contrast, the record here reveals no basis to conclude Fateh's jury was confused about the instructions or the necessity to prove his personal mens rea. (See *People v. Mejia, supra,* 211 Cal.App.4th at p. 625; *People v. Samaniego, supra,* 172 Cal.App.4th at pp. 1165-1166; *People v. Lopez, supra,* 198 Cal.App.4th at p. 1119.)

27

Further, unlike in *Nero* and *Loza,* the evidence here did not readily allow for the possibility Fateh might have been guilty as an aider and abettor, but only of a lesser offense than the actual perpetrators. In *Nero,* there was evidence from which the jury could have found the sister acted upon a sudden quarrel, or in the heat of passion. In *Loza,* the jury had expressed concern that the aider and abettor might have acted because she was worried about an attack. (*People v. Nero, supra,* 181 Cal.App.4th at p. 519; *People v. Loza, supra,* 207 Cal.App.4th at pp. 349, 356-357.) Here, in contrast, there was no similar evidence suggesting Fateh might have been guilty of a lesser offense or degree. Fateh drove the car to the crime scene, double parked, waited while Gonzales and Vasquez exited and confronted the victims, waited for them to return to the car, and drove off. The entire incident took only two minutes. The jury clearly rejected the "drug deal gone bad" theory offered by the defense, and in any event Gonzales's testimony was silent on whether Fateh was purportedly expecting a drug deal to transpire. There was no evidentiary basis from which the jury could have concluded Fateh, alone among the group, misguidedly thought they were simply off to purchase marijuana.

Fateh argues that the fact the jury found the hate-crime allegation not true as to him, but true as to the actual perpetrators, demonstrates it completely rejected the People's theory of guilt as to him. Therefore, he argues, the only explanation for the guilty verdicts on the attempted murder counts is that the jury relied upon the incorrect instruction to assume he was "equally guilty" as his codefendants because he drove the getaway car. In our view, however, the fact the jury found the hate-crime allegations not true as to Fateh, but true as to Gonzales and Vasquez, indicates just the opposite: the jury clearly understood that it had to evaluate Fateh's mental state and intent independently, and understood that Fateh could have a *less culpable* mental state than the actual assailants.

Nor do we believe the jury was mislead by the prosecutor's arguments. Just before the portion of the argument challenged by Fateh, the prosecutor went over the requirements of aiding and abetting, including that the aider and abettor have knowledge

28

and intent.[11]  The prosecutor's argument highlighted that the jury was required to consider Fateh's own mental state.  In sum, it is clear beyond a reasonable doubt that Fateh would not have obtained a more favorable verdict had the phrase "equally guilty" been omitted from the instruction.

      3.  *Correction of the abstract of judgment.*

At Fateh's sentencing, the trial court stated it was "imposing restitution in the amount of $2,208.81 to the victim compensation and Government Claims Board.  This order of restitution is joint and several with his co-defendants who have previously been sentenced."  The court imposed the same "joint and several" restitution order on appellants Vasquez and Gonzales.  Fateh's abstract of judgment states that restitution was imposed "with co-defendants," but does not contain the language "joint and several." Fateh contends that the abstract of judgment must be corrected to accurately reflect that the restitution order is joint and several, and the People agree.  Where an abstract of judgment differs from the court's oral pronouncements, the abstract does not control.  Any discrepancy is deemed to be the result of clerical error, which may be corrected on appeal.  (*People v. Mitchell* (2001) 26 Cal.4th 181, 185; *People v. Walz* (2008) 160 Cal.App.4th 1364, 1367, fn. 3.)  We order the abstract of judgment corrected accordingly.

---

[11]    The prosecutor argued:  "Here's basically the elements of the legal concept of aiding and abetting.  And remember from jury selection we talked about the bank robber pulling up, the guy outside knows there's a robbery, the guy goes inside, that basic concept of aiding and abetting is spelled out right here.  First of all, you have a perpetrator that committed the crime.  The defendant knew the perpetrator was going to commit the crime.  Before or during the crime the defendant intended to aid and abet the perpetrator in committing the crime, and the defendant's words or conduct did, in fact, aid and abet the perpetrator in committing the crime.  Someone aids and abets a crime if he or she knows of the perpetrator's unlawful purpose and he or she specifically intends to and does, in fact, aid, facilitate, promote, encourage or instigate the perpetrator's commission of that crime.  That applies to Mr. Fateh as the get-away driver, it applies to Mr. Vasquez as the person who issues the racial slur.  He's promoting and encouraging and instigating."  The challenged portion of the prosecutor's argument, set forth *ante,* immediately followed these statements.

## DISPOSITION

The clerk of the superior court is ordered to correct the abstract of judgment for appellant Ali Fateh to show that Fateh is jointly and severally liable for payment of $2,208.81 to the Victim Restitution and Government Claims Board, and to forward a corrected copy of the abstract to the Department of Corrections.  In all other respects, the judgment is affirmed.


**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**



ALDRICH, J.


We concur:


KLEIN, P. J.


KITCHING, J.